UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------------- x

YVROSE JEAN-BAPTISTE,

                              Plaintiff,

        -against-

NYC DEPARTMENT OF EDUCATION, DINA KOSKI,
Officially and Individually, DEBRA GERSHMAN,
Officially and Individually,

                          Defendants.

-------------------------------------------------------------------- x

**DECLARATION**

07 CV 3535 (FB)(CP)

       **ANDREA O'CONNOR** declares, pursuant to 28 U.S.C. § 1746 and subject to the penalties of perjury, that the following is true and correct:

       1.  I am an Assistant Corporation Counsel in the office of Michael A. Cardozo, Corporation Counsel of the City of New York, attorney for the defendants in the above-captioned action.

       2.  I submit this declaration in support of the defendants' motion for summary judgment pursuant to Rule 56(b) of the Federal Rules of Civil Procedure.

       3.  Annexed to this declaration are Exhibits "A" to "NNN" are documents maintained in the ordinary course of defendants' business, public records, excerpts from the transcripts of the depositions of plaintiff and Dina Koski, and which are relied upon and cited in defendant's Local Civil Rule 56.1 Statement Of Undisputed Material Facts submitted herewith in support of defendants' motion.  Copies of these documents and excerpts are as follows:

       A.      Excerpts from the transcript of plaintiff's deposition, taken on July 17, 2008, are annexed hereto as Exhibit "A;"

B.     Plaintiff's First Amended Complaint filed in this action, dated January 24, 2008, is annexed hereto as Exhibit "B;"

C.     Application #1 for Transfer to Further Integration, dated May 15, 2003, is annexed hereto as Exhibit "C;"

D.     Excerpts from the transcript of Dr. Dina Koski's deposition, taken on August 5, 2008, are annexed hereto as Exhibit "D;"

E.     Letter from Dr. Dina Koski to "Parents," dated October 21, 2003, is annexed hereto as Exhibit "E;"

F.     Letter from Dr. Dina Koski to "Parents," dated November 13, 2003, is annexed hereto as Exhibit "F;"

G.     Letter from Dr. Koski to plaintiff, dated October 22, 2004, is annexed hereto as Exhibit "G;"

H.     Letter from AP Gershamn to plaintiff, dated November 3, 2004, is annexed hereto as Exhibit "H;"

I.     Letter, with attachments, from plaintiff to Daniel Feldman, dated October 30, 2004, is annexed hereto as Exhibit "I;"

J.     Letter from Dr. Koski to plaintiff, dated November 15, 2004, is annexed hereto as Exhibit "J;"

K.     Letter from Dr. Koski to plaintiff, undated, is annexed hereto as Exhibit "K;"

L.     Letter from "Parent"[1] to Dr. Koski, dated December 6, 2004, is annexed hereto as Exhibit "L;"

---

[1] As required by the Federal Educational Rights and Privacy Act ("FERPA"), defendants are prohibited, as a matter of law, from disclosing information regarding students absent a court order or the consent of the student. See

M.     Letter from Dr. Koski to plaintiff, dated December 10, 2004, is annexed hereto as Exhibit "M;"

N.     Article 8 (J) of the collective bargaining agreement covering the United Federation of Teachers and the DOE for June 2003 through October 2007, is annexed hereto as Exhibit "N;"

O.     Annual Professional Performance Review and Report on Probationary Service of Pedagogical Employee, dated June 10, 2005, is annexed hereto as Exhibit "O;"

P.     UFT Step I Grievance, dated November 17, 2004, is annexed hereto as Exhibit "P;"

Q.     UFT Step I Grievance and EEOC Complaint, dated November 19, 2004, is annexed hereto as Exhibit Q;"

R.     Step I Grievance form, dated November 19, 2004, is annexed hereto as Exhibit "R;"

S.     Step I Grievance Form, dated December 6, 2004, is annexed hereto as Exhibit "S;"

T.     Letter from Dr. Koski to plaintiff, dated December 16, 2004, is annexed hereto as Exhibit "T;"

U.     Article 22(B)(1)(A) of the collective bargaining agreement covering the United Federation of Teachers and the DOE for June 2003 through October 2007, is annexed hereto as Exhibit "U;"

---

Federal Educational Rights and Privacy Act ("FERPA"), 20 U.S.C. § 1232g. As such, defendants' have redacted the name of the parent, and the student, in compliance with FERPA.

V.      Step II Conference Concerning the Grievance of Yvrose Jean-Baptiste, a Teacher at PS 26, dated January 12, 2005, is annexed hereto as Exhibit "V;"

W.      Step 1 Grievance Form, dated January 31, 2005, is annexed hereto as Exhibit "W;"

X.      Letter from Dr. Koski to plaintiff, dated February 8, 2005, is annexed hereto as Exhibit "X;"

Y.      Grievance, with attachments, dated October 24, 2005, is annexed hereto to as Exhibit "Y;"

Z.      Letter from Dr. Koski to plaintiff, dated November 2, 2005, is annexed hereto as Exhibit "Z;"

AA.     Note from K. David Tavakoli, M.D., dated November 10, 2005, is annexed hereto as Exhibit "AA;"

BB.     Note from K. David Tavakoli, M.D., undated, is annexed hereto as Exhibit "BB;"

CC.     Letter from J. Roosevelt Clerisme, M.D., dated November 17, 2005, is annexed hereto as Exhibit "CC;"

DD.     Letter from Dr. Koski to plaintiff, dated November 23, 2005, is annexed hereto as Exhibit "DD;"

EE.     Note from K. David Tavakoli, M.D., dated November 28, 2005, is annexed hereto as Exhibit "EE;"

FF.     Letter from J. Roosevelt Clerisme, M.D., dated November 29, 2005, is annexed hereto as Exhibit "FF;"

GG.   Letter from Dr. Koski to Walter O'Brien, Local Instructional Superintendent, dated November 28, 2005, is annexed hereto as Exhibit "GG;"

HH.   Letter from Walter O'Brien to Heidy Lystad, undated, is annexed hereto as Exhibit "HH;"

II.   Letter from Mercuria Gibson to plaintiff, dated December 7, 2005, is annexed hereto as Exhibit "II;"

JJ.   Letter from J. Roosevelt Clerisme, M.D., dated December 15, 2005, is annexed hereto as Exhibit "JJ;"

KK.   Comprehensive Injury Report, dated December 16, 2005, is annexed hereto as Exhibit "KK;"

LL.   Application for UFT Sabbatical Leave of Absence, dated January 5, 2006, is annexed hereto as Exhibit "LL;"

MM.   Employee Medical Review, dated January 9, 2006, is annexed hereto as Exhibit "MM;"

NN.   Letter from Dr. Koski to plaintiff, dated September 7, 2006, is annexed hereto as Exhibit "NN;"

OO.   Letter from Dr. Koski to plaintiff, dated September 13, 2006, is annexed hereto as Exhibit "OO;"

PP.   Letter from Dr. Koski to plaintiff, dated September 13, 2006, is annexed hereto as Exhibit "PP;"

QQ.   Letter from Sheila Behrman to Dr. Koski, dated January 12, 2007, is annexed hereto as "QQ;"

RR.   Letter from Dr. Koski to plaintiff, dated January 19, 2007, is annexed hereto as "RR;"

SS.   Letter from Dr. Koski to plaintiff, dated March 27, 2007, is annexed hereto as "SS;"

TT.   Letter from Dr. Koski to plaintiff, dated June 18, 2007, is annexed hereto as "TT;"

UU.   Letter from J. Roosevelt Clerisme, M.D., dated September 25, 2006, is annexed hereto as "UU;"

VV.   Report of Reasons for Requesting Medical Examination of Employee, is annexed hereto as "VV;"

WW.   Employee Medical Review, dated October 16, 2006, is annexed hereto as "WW;"

XX.   Note from K. David Tavakoli, M.D., undated, is annexed hereto as Exhibit "XX;"

YY.   Comprehensive Injury Report, dated November 8, 2006, is annexed hereto as Exhibit "YY;"

ZZ.   Note from K. David Tavakoli, M.D., dated November 9, 2006, is annexed hereto as Exhibit "ZZ;"

AAA.   Note from K. David Tavakoli, M.D., dated November 21, 2006, is annexed hereto as Exhibit "AAA;"

BBB.   Note from Aryel Nicoleau, M.D., dated November 24, 2006, is annexed hereto as Exhibit "BBB;"

CCC. Letter from Dr. Koski to plaintiff, dated September 17, 2007, is annexed hereto as Exhibit "CCC;"

DDD. Letter from Dr. Koski to plaintiff, dated October 3, 2007, is annexed hereto as Exhibit "DDD;"

EEE. Letter from Dr. Koski to plaintiff, dated December 6, 2007, is annexed hereto as Exhibit "EEE;"

FFF. Letter from Dr. Koski to plaintiff, dated January 7, 2008, is annexed hereto as Exhibit "FFF;"

GGG. Letter from Christine J. Kicinski to plaintiff, dated May 6, 2005, is annexed hereto as Exhibit "GGG;"

HHH. Charge of Discrimination, dated May 13, 2005, is annexed hereto as Exhibit "HHH;"

III. Final Investigation Report and Basis of Determination, dated April 25, 2007, is annexed hereto as Exhibit "III;"

JJJ. Determination and Order After Investigation, dated April 25, 2007, is annexed hereto as Exhibit "JJJ;"

KKK. Dismissal and Notice of Rights, dated June 7, 2007, is annexed hereto as Exhibit "KKK;"

LLL. Plaintiff's Complaint filed in this action, dated August 22, 2007, is annexed hereto as Exhibit "LLL;"

MMM. Docket Sheet in Jean-Baptiste v. NYC Department of Education, et al., Docket No. 07 CV 3535 (FB)(CLP), is annexed hereto as Exhibit "MMM;"

NNN. Annual Professional Performance Review and Report, dated May 12, 2004, is annexed hereto as Exhibit "NNN."

I declare, under penalty of perjury, that the foregoing is true and correct.

Dated:      New York, New York
            May 1, 2009


                              MICHAEL A. CARDOZO
                              Corporation Counsel of the
                                 City of New York
                              Attorney for Defendants
                              100 Church Street, Rm. 2-146
                              New York, New York 10007
                              (212) 676-2750
                              aoconnor@law.nyc.gov


                       By:    _____
                              Andrea O'Connor
                              Assistant Corporation Counsel


- 8 -

**Exhibit A**

1   UNITED STATES DISTRICT COURT
    EASTERN DISTRICT OF NEW YORK
2   --------------------------------------------X
    YVROSE JEAN-BAPTISTE,
3
                                    PLAINTIFF,
4
                                    Index No:
5                   -against-       07cv3535
                                    (FB)(CLP)(ECF)
6
    NYC DEPARTMENT OF EDUCATION, DINA KOSKI,
7   Officially and Individually, DEBRA GERSHMAN,
    Officially and Individually,
8
                                    DEFENDANTS.
9   --------------------------------------------X

10                   DATE: July 17, 2008

11                   TIME: 10:16 a.m.

12

13

14          EXAMINATION BEFORE TRIAL of the Plaintiff,

15   YVROSE JEAN-BAPTISTE, taken by the Defendants, pursuant to

16   a Notice and to the Federal Rules of Civil Procedure, held

17   at the Law Offices of MICHAEL A. CARDOZO, ESQ., CORPORATION

18   COUNSEL, THE NEW YORK CITY LAW DEPARTMENT, 100 Church

19   Street, Fourth Floor, New York, New York 10007, before a

20   Notary Public of the State of New York.

21

22

23

24

25

```
 1    A P P E A R A N C E S:

 2

 3

 4    LAW OFFICE OF DAVID WIMS, ESQ.
             Attorney for Plaintiff
 5           1430 Pitkin Avenue, Second Floor
             Brooklyn, New York 11233
 6           BY: DAVID C. WIMS, ESQ.

 7

 8    MICHAEL A. CARDOZO, ESQ.
      CORPORATION COUNSEL
 9           Attorney for the Defendants
             100 Church Street
10           New York, New York 10007
             BY: ANDREA M. O'CONNOR, ESQ.
11           File #: 2007-028228
             Control #: JJJ02497
12

13

14    ALSO PRESENT:

15
             Adeniyi Taiwo - Intern for Corporation Counsel
16

17

18

19

20              *           *           *

21

22

23

24

25
```

Y. JEAN-BAPTISTE

1      Q.      Do you maintain any other residence other than
2    the address you gave earlier?
3      A.      No.
4      Q.      Where did you live prior to your current address?
5      A.      198-20 Epsom Course. I was -- One second.
6    198-20 Epsom Course, and I was living with my brother in
7    Florida, too, when I moved, yes.
8      Q.      When did you move to Florida?
9      A.      Um, last June 1st. June 1st.
10     Q.      June 1st of 2007 or 2008?
11     A.      2008.
12     Q.      Just a couple of months?
13     A.      I was with my brother.
14     Q.      How long did you live at the previous address
15   that you just said that you lived with your brother, how
16   long did you live there?
17     A.      In Florida?
18     Q.      The other address that you gave where you lived
19   with your brother, that was in Florida as well?
20     A.      Yes, that was in Florida.
21     Q.      How long did you reside there for?
22     A.      Like I could say, let me see, June, one month and
23   a half. I just moved to that address, 5003.
24     Q.      Prior to that moving in with your brother, what
25   was your address?

Y. JEAN-BAPTISTE

1    Q.    So, from 1990 to 1996?

2    A.    Yes.  In 1996 I became tenured.

3    Q.    Starting in January of 1990, were you, and during

4    those six years when you were a long-term substitute, were

5    you at one school or did you go around to different

6    schools?  So I guess my question is, did you stay at one

7    school during the six years?

8    A.    When I first started, I started in, in Queens.

9    Q.    Yes.

10   A.    And a lady was, I was substituting for a lady.

11   And then after that I went to work in a bilingual school,

12   P.S. 186, yes.

13   Q.    How long were you in the Queens school

14   substituting?

15   A.    For the term, to June.

16   Q.    So from January 1990 to June of 1990?

17   A.    Yes.

18   Q.    Now at P.S. --

19   A.    186.

20   Q.    How long were you at that school?

21   A.    From 1990 to 1994.

22   Q.    What grades did you teach at P.S. 186?

23   A.    Kindergarten and first grade.

24   Q.    After P.S. 186, what school were you assigned at?

25   A.    I went to P.S. 34 or 134 in Queens.

Y. JEAN-BAPTISTE

1    Q.    So you went there for the 1994-1995 school year?

2    A.    Yes, that is in '94 and 1995.

3    Q.    Were you there for the 1996 term?

4    A.    1996.

5    Q.    What grades did you teach at P.S. 134?

6    A.    ESL.

7    Q.    Was that for all grades?

8    A.    All with the early childhood, yes.

9    Q.    You said in 1996 you became tenured, correct?

10   A.    Was it?  Yes, 1996.

11   Q.    Where were you assigned in 1996?

12   A.    I was at 134.

13   Q.    Still at 134?

14   A.    Uh-huh.

15   Q.    And after 134?

16   A.    So I went to P.S. 22.

17   Q.    When did you go to P.S. 22?

18   A.    In November of 1996.

19   Q.    How long were you at P.S. 22?

20   A.    I left P.S. 22 --  I was there in 1996 and I

21   think I left it in 2000, 2001.

22   Q.    What school did you go to in 2001?

23   A.    117.

24   Q.    How long were you at P.S. 117?

25   A.    For two years.

Y. JEAN-BAPTISTE

1    Q.     Until 2003?

2    A.     2003.

3    Q.     Going back to P.S. 22, what grades did you teach

4    there?

5    A.     Early childhood.

6    Q.     At P.S. 117?

7    A.     Kindergarten.

8    Q.     Going back to 1996, that is the year you said you

9    were tenured at P.S. 134 teaching ESL, correct?

10   A.     Uh-huh.

11   Q.     Do you recall who your supervisors were at P.S.

12   134?

13   A.     It was Mr. Hamilton.

14   Q.     Did Mr. Hamilton evaluate your job performance

15   while you were there?

16   A.     Yes, it was there, too.

17   Q.     What did their job performance evaluations

18   generally say?

19   A.     Satisfactory.

20   Q.     Were you ever disciplined at P.S. 134?

21   A.     No.

22   Q.     Why did you leave P.S. 134 to go to P.S. 22?

23   A.     Because, um, I didn't like the moving up and

24   down, picking up children.  And there was an early

25   childhood position, so, where I could be in a classroom.

24

Y. JEAN-BAPTISTE

1       So that is why I went there.

2       Q.      You were not in a classroom at P.S. 134?

3       A.      No, it was like ESL pullout.

4       Q.      Oh, pullout, push in?

5       A.      Yeah.  Push in, yes.

6       Q.      So the children were rotating throughout the day?

7       A.      Yeah, going to different classrooms to pick up

8   children.

9       Q.      At P.S. 22 you were assigned a class?

10      A.      Uh-huh.

11      Q.      You said you taught early childhood at P.S. 22,

12  do you recall the grades you taught there?

13      A.      First grade.

14      Q.      You taught first grade from 1996 to 2001?

15      A.      First grade.  Let me see.  And then I do the last

16  two years, second grade.  First grade, two years and second

17  grade, the last two years.

18      Q.      Do you recall who your supervisor was at P.S. 22?

19      A.      Let me see.

20      Q.      Or who the principal was?

21      A.      That was Miss Rosefort. And then there was

22  Miss Weston.

23      Q.      Now, Did Miss Rosefort evaluate your job

24  performance?

25      A.      Yes.

Y. JEAN-BAPTISTE

1    Q.    What did those job performances say?

2    A.    S, always S.

3    Q.    So, satisfactory?

4    A.    Satisfactory.

5    Q.    Did Miss Weston evaluate your job performance?

6    A.    Yes, satisfactory.

7    Q.    Were you ever disciplined while you were at P.S.

8    22?

9    A.    In what sense do you mean "disciplined"?

10   Q.    Did you ever receive charges or specifications?

11   A.    No.

12   Q.    Did you ever receive a reprimand?

13   A.    No.

14   Q.    Did you ever receive any other types of

15   discipline?

16   A.    Like letters?

17   Q.    Did you ever receive letters to your file?

18   A.    No.

19   Q.    Did you ever receive letters to your file at P.S.

20   134?

21   A.    No.

22   Q.    Why did you transfer from P.S. 22 to P.S. 117?

23   A.    Oh, then my mom was kind of sick and I wanted to

24   be, I wanted to be closer.  I wanted to be in Queens.

25   Q.    Where is P.S. 22?

26

Y. JEAN-BAPTISTE

| | | |
|---|---|---|
| 1 | A. | That is in Brooklyn. |
| 2 | Q. | So, you had requested a transfer from -- |
| 3 | A. | Yes. |
| 4 | Q. | -- P.S. 22 to 117? |
| 5 | A. | Yes. |
| 6 | Q. | Who was your supervisor at P.S. 117? |
| 7 | A. | Mr. Radin, he was my immediate supervisor. |
| 8 | Q. | Any other supervisors at P.S. 117? |
| 9 | A. | I think the principal was Mrs. Zentner. |
| 10 | Q. | Who was Mr. Ladin? |
| 11 | A. | Radin, R-A. |
| 12 | Q. | Oh, Radin. |
| 13 | A. | He was my immediate supervisor. |
| 14 | Q. | Did Mr. Radin evaluate your job performance? |
| 15 | A. | Yes. |
| 16 | Q. | What did those evaluations generally say? |
| 17 | A. | Satisfactory, but highly. |
| 18 | Q. | Did Ms. Zentner evaluate your job performance? |
| 19 | A. | Yes, mathematics. |
| 20 | Q. | I'm sorry? |
| 21 | A. | Yes. |
| 22 | Q. | What did those performances say? |
| 23 | A. | Satisfactory. |
| 24 | Q. | You had indicated you taught kindergarten both |
| 25 | years? | |

Y. JEAN-BAPTISTE

1     A.     Uh-huh, yes.

2     Q.     Were you ever disciplined while you were at P.S.

3     117?

4     A.     No.

5     Q.     Did you ever receive any reprimand?

6     A.     No.

7     Q.     Any letters to your file?

8     A.     No.

9     Q.     Now, after P.S. 117, where did you go next?

10     A.     To P.S. 26.

11     Q.     When was that?

12     A.     2003, September 2003.

13     Q.     You first reported to P.S. 26 in September of

14     2003 --

15     A.     Yes.

16     Q.     -- for the start of the new school year?

17     A.     Yes.

18     Q.     Why did you transfer from P.S. 117 to P.S. 26?

19     A.     Because P.S. 26 was closer to my house.  Because

20     I wanted to be closer to my mother.

21     Q.     How did you request that transfer?

22     A.     Oh, at that time they used different kinds of

23     transfers.  There was an interracial transfer and they use

24     a seniority transfer.  So I got there on an interracial

25     transfer.

Y. JEAN-BAPTISTE

1      A.      I had, I was observed, you know.  Do you want me

2  to tell you how many times?

3      Q.      Yes.

4      A.      Two formal observations by Dr. Koski and one by

5  Mrs. Gershman.

6      Q.      Now for the 2007-2008 school year, how many

7  formal observations did you have during that school year?

8      A.      Yes, I just told you, three.

9      Q.      That was for the 2006 to --

10      A.      No, no, 2007-2008.

11      Q.      Now for 2006-2007, was that still one?

12      A.      2006-2007?  Yes, I had one in reading.

13      Q.      Who was that conducted by?

14      A.      Dr. Koski.

15      Q.      Now over your entire tenure with the DOE starting

16  from January of 1990 to now, have you ever had charges and

17  specifications filed against you?

18      A.      Charges of what?

19      Q.      Charges and specifications, formal discipline?

20      A.      No.

21      Q.      Have you ever been reprimanded during your entire

22  tenure at DOE?

23      A.      What do you mean by that?  Did I ever have

24  letters in my file?

25      Q.      Correct.

Y. JEAN-BAPTISTE

1    A.    P.S. 26.

2    Q.    Approximately how many letters to your file did

3    you receive at P.S. 26?

4    A.    I just cannot count.

5    Q.    Can you give an approximation?

6    A.    I cannot count.

7          MR. WIMS: She is asking you to approximate.

8    Q.    Was it more than five?

9    A.    I said I cannot count.

10   Q.    I am going to go through some of the allegations

11   that you have in the complaint in this case.

12         Now you allege that prior to you coming to P.S.

13   26 in September '03 that Dr. Koski called you; can you

14   describe that phone call?

15   A.    Yes.  Around 4:00 p.m. I received a phone call

16   and she introduced herself and she said, "I understand you

17   are coming.  You got a transfer for early childhood, but I

18   am telling you now I don't have an early childhood

19   position.  I have a fifth grade position."  And I asked

20   her, "how did you get my name and number?"  She said,

21   "through the system."

22   Q.    I'm sorry, "through the system"?

23   A.    "Through the system."  Because I had, at that

24   time, I had not received the letter, the official letter

25   from the Board of Education.  Then she gave me the number

35

Y. JEAN-BAPTISTE

1    of Mrs. De Lucas.  She was, I think, the personnel director

2    for District 26.

3    Q.    For District 26?

4    A.    Yes.

5    Q.    Did Dr. Koski say anything else during this phone

6    call?

7    A.    She just told me she doesn't have an early

8    childhood position and to call the personnel director.  But

9    when I went out the same day, and at night she called my

10    mother, she called, and my mother picked up the phone.  And

11    when I came back, when I came home, my mother told me that

12    "Dr. Koski called you again."

13    Q.    During the first time she called, when she said

14    there wasn't an early childhood class, there was only a

15    fifth grade class, did you say anything in response to

16    this?

17    A.    No, she gave me the number.

18    Q.    She gave you the number of?

19    A.    Of the personnel director of --

20    Q.    Miss De Lucas?

21    A.    Yes.

22    Q.    Now you said on the same day she called a second

23    time, correct?

24    A.    Yes, she called a second time.

25    Q.    Did you speak to her a second time?

Y. JEAN-BAPTISTE

1    A.    No, I wasn't home.  It was to my mom.

2    Q.    Did you call Miss De Lucas?

3    A.    Yes.

4    Q.    What did you say to Miss De Lucas?

5    A.    I told her that Dr. Koski just gave me her number

6    to call.  And she said --  Well, to call.  She asked me

7    "where do you live?"  I said, "Holliswood."  She said,

8    "maybe there is nothing."

9    Q.    Maybe there is nothing --

10   A.    "Nothing."

11   Q.    -- in terms of an early childhood class?

12   A.    An early childhood position or something like

13   that.

14   Q.    Did she say anything else?

15   A.    I don't recall.  I mean, it has been since 2003.

16   I think she said she would call me back, yes.

17   Q.    Did she call you back?

18   A.    No.

19   Q.    Did you call anybody else about the assignment at

20   P.S. 26 after you spoke to Dr. Koski?

21   A.    I called her back, De Lucas, I think in July when

22   I said, you know, "where am I standing, because Dr. Koski

23   had offered me a fifth grade position?"  And she told me,

24   "well, it is not too late to go back to your other school.

25   You can always decline and go back to the other school."

Y. JEAN-BAPTISTE

1    And that was in July.

2         Q.      But since you entered P.S. 26 you didn't decline

3    the transfer?

4         A.      No, I did not.  I left the other place and I

5    didn't want to go back there.

6         Q.      Why didn't you want to go back there?

7         A.      No.  I mean, I told them that, you know, I wanted

8    to be closer to my mother because it was one mile and --

9    one mile.  So I don't see why I have to go like from

10   something, a place that used to take me like 15 minutes.

11   It is like five minutes now to my work, yes.

12        Q.      Now, Ms. Jean-Baptiste, do you know a

13   Miss Heimbender, H-E-I-M-B-E-N-D-E-R?

14        A.      Yes.

15        Q.      How do you know her?

16        A.      She is a teacher in the school.

17        Q.      At P.S. 26?

18        A.      Yes.

19        Q.      Do you know how long she has been at P.S. 26?

20        A.      I think a year before I came, I think.  Yeah, I

21   came in 2003.  I believe she started like 2002, 2003, yes.

22        Q.      Do you know how long she has been employed by the

23   DOE, not just at P.S. 26, but in total?

24        A.      (No response.)

25        Q.      If you don't know, that is okay.

Y. JEAN-BAPTISTE

1    to substitute.  She told me to go to Mrs. Levy, the

2    secretary, to give me the paper, so I could go where I

3    should go.

4        Q.    The paper that had your assignments on it?

5        A.    Yeah, the substitute teacher form.  So every

6    morning I had to go to her because she had to give me the

7    assignment form to go to different classes.

8        Q.    So, I see.  Every morning you would go to

9    Mrs. Levy and Mrs. Levy would give you the assignment?

10       A.    Yes.

11       Q.    And Miss Levy is?

12       A.    She was the secretary.

13       Q.    When Mrs. Pavano left for maternity leave, what

14   happened to her first grade class?

15       A.    I believe they split, they split the class, yes.

16   She gave a group of kids to different teachers.

17       Q.    So another teacher didn't come in to teach it?

18       A.    No, no.  She just split the children.

19       Q.    They went into --

20       A.    She closed the class.  That class was closed.

21       Q.    So, now starting in the week before Thanksgiving

22   in November 2003 --

23       A.    Yes.

24       Q.    -- when you started, I believe it was the second

25   grade?

Y. JEAN-BAPTISTE

1    A.      How did I know?

2    Q.      How did you know?

3    A.      How did I know?  I don't recall.  I heard about

4  it, yes.  I had more, I mean, overall more seniority, yes.

5    Q.      How did you know you had overall more seniority

6  than Mrs. Pavano?

7    A.      I mean, this was --  I don't recall how I knew,

8  but I knew that.

9    Q.      Do you think that you were given the assignments

10  in violation of the Collective Bargaining Agreement because

11  of your race?

12    A.      Because of my race?

13    Q.      Yes.

14    A.      Yes.

15    Q.      Why do you think that?

16    A.      Because I was being shuffling around in the

17  building.

18    Q.      Any other reasons why you think it was because of

19  your race?

20    A.      What other reasons it was?  I was the only one in

21  the building shuffling around doing all these things, yeah.

22    Q.      Did you believe you received these assignments

23  because of your national origin?

24    A.      I am not...

25    Q.      Did you believe that you received these

53

Y. JEAN-BAPTISTE

1    assignments because of your national origin?

2        A.    I believe, yes.

3        Q.    Why do you believe that?

4        A.    Yes, I believe that?

5        Q.    Yes.

6        A.    Because of certain comments.

7        Q.    What types of comments?

8        A.    I mean, like if I, several times I was talking I

9    was having a conference with the principal and like she was

10   repeating certain words I said, like (indicating).  Like

11   the way I said it, yes.  And then she made some comments in

12   front.  There was meetings and she said like, "Haitian

13   people don't use the T-H," yes.  "We have to teach the

14   children phonics."

15       Q.    Any other comments?

16       A.    I can't recall.

17       Q.    When you spoke about a conference you had with

18   Dr. Koski when she would repeat back your --

19       A.    Yes, certain words I pronounced she would repeat

20   them the same way I pronounced them (indicating)

21       Q.    What type of conference is this?

22       A.    Like when -- because --  I don't know.  I wasn't

23   in the office all the time, yes.  I can't recall.  It is

24   all the time.  When I was in the office going with books,

25   with this, with that, all the time, yes.

DIAMOND REPORTING  (718) 624-7200  info@diamondreporting.com

Y. JEAN-BAPTISTE

1      Q.      Why would Dr. Koski repeat back the words that

2  you were saying?

3      A.      Maybe --

4              MR. WIMS: Objection.

5      Q.      If you know?

6      A.      I don't know.  Maybe if I said a word she would

7  repeat the word and...

8      Q.      How many times did this occur?

9      A.      A couple of times.

10     Q.      A couple of different times in --

11     A.      A couple of different times.

12     Q.      Let me finish the question.

13             A couple of times in the same conference or a

14  couple of times at different conferences?

15     A.      Different conferences.

16             MR. WIMS: Let her finish the question.

17     Q.      By "a couple of times," do you mean two, do you

18  mean three?

19     A.      Three or four.

20     Q.      What would you be talking about when she would do

21  this?

22     A.      Different, I mean, things about --  Whenever she

23  called me to the office and I had to go if I had to discuss

24  something with her.

25     Q.      Now you said you were at a meeting where

Y. JEAN-BAPTISTE

1  Dr. Koski said something to the effect of that people from

2  Haiti can't say T-H, what?

3      A.      Haitian people don't pronounce the T-H. We have

4  to teach the children phonics.  That was the first day of

5  school, yes.

6      Q.      What year was that?

7      A.      I believe I just came back from my sabbatical.  I

8  believe so, I think so.  No, no, no, that was -- Let me

9  think.  I think, 2006.

10     Q.      2006?

11     A.      2006.  I believe 2005, 2006.

12     Q.      So the 2005-2006 school year?

13     A.      Yes, 2005, yes.

14     Q.      What type of meeting was this?

15     A.      That was a meeting like --  It was the first day

16  of school, like all the teachers convene together and I

17  think she was introducing some of the new teachers, yes.

18     Q.      Okay.

19     A.      Yes.

20     Q.      Can you describe what she was talking about when

21  she made this comment?

22     A.      I don't recall, but it was something about, I

23  mean, I think it was about, yeah, that was --  I don't

24  know, I don't remember.  It was, all the teachers were

25  there and then, they were talking about various things and

Y. JEAN-BAPTISTE

1    she introduced a couple of the teachers, the new teachers.

2              And then there was talk about something about

3    phonics, they were talking about some of the programs.  And

4    then she said, "Haitian, Haitian people don't use T-H.  We

5    have to teach the children phonics."

6        Q.    Did she ever make a comment similar to that any

7    other time?

8        A.    Any other time?  I don't recall.  The last time

9    in this school year, I think I had to go make copies.  And

10   when, I had to, when we were meeting together with the

11   union, she said, "I have to make copies.  I have to make

12   copies."

13       Q.    When you said "she," you are talking --

14       A.    About Koski.  I said, "I have to make copies."  I

15   told her "I have to go upstairs to make copies."  But she

16   was impeding.  She said, "I have to make copies.  I have to

17   make copies" (indicating)

18       Q.    So she was repeating what you said?

19       A.    Yes, with my accent.

20       Q.    Did she ever do anything like that at any other

21   time?

22       A.    What?

23       Q.    Did Dr. Koski ever do anything like that any

24   other time?

25       A.    What time?  With this thing, repeating?

Y. JEAN-BAPTISTE

1    Q.    Yes, with the repeating.

2    A.    Several, couple of times.

3    Q.    At conferences?

4    A.    A couple of times.

5    Q.    And this time with the copies?

6    A.    I went upstairs before a meeting and then that is

7    when, yes.

8            MS. O'CONNOR: Does anybody need a break? Off

9            the record.

10           (Whereupon, an off-the-record

11   discussion was held.)

12   Q.    Ms. Jean-Baptiste, you also allege in your

13   complaint that Dr. Koski harassed you; can you describe

14   what you mean by that?  I guess, how did she harass you?

15   A.    How?  How?

16   Q.    Yes.

17   A.    I used to be in her office all the time with the

18   letter of disciplinary actions.  I cannot count how many

19   letters.  All the time there is letter in my file.  And at

20   one time I had to carry, like, some letters with me in case

21   she, Dr. Koski called me for a meeting, an unannounced

22   meeting, yes.  Disciplinary action.

23   Q.    Now what type of disciplinary action are you

24   referring to?

25   A.    I don't know.  When, I got this every time I

Y. JEAN-BAPTISTE

1    emergency, like I have to leave, to leave early, she won't

2    let me.  She forces you -- She doesn't want me to go.  She

3    will write letters and stuff like that.  There are other

4    ways, things she had been doing to me all the time besides

5    going to the office for meetings that would lead to this

6    disciplinary action, so.  Other things, yes.

7        Q.    Other than the leaving early, what are the other

8    things you are talking about?

9        A.    A lot of things.  Coming to the room all the time

10   and bringing outsiders, people, I don't know, to my

11   classroom.

12       Q.    Any other ways?

13       A.    I can't think right now.

14       Q.    Now, going back to what you just testified to; if

15   you ever had an emergency and had to leave early, was there

16   ever a time that Dr. Koski wouldn't let you leave early?

17       A.    Let me see.  The last thing I remember, that

18   happened this year.  You want me to say something?

19       Q.    Sure.

20       A.    I had to take, I took my mom to the doctor on, I

21   think it was on Wednesday night, but she had to go for a

22   test.  That technician usually comes on Thursday and they

23   squeezed, they made a, scheduled an appointment for my mom

24   around 2:00 something.  And then, I wasn't aware of that,

25   and then that morning I went there, I told the secretary

Y. JEAN-BAPTISTE

1   about what they talk about in the meeting, what was

2   discussed in the meeting.

3       Q.      You also said that Dr. Koski sent outsiders to

4   your classroom?

5       A.      I don't know.  I saw people coming to my

6   classroom.

7       Q.      What people would come into the classroom?

8       A.      I don't know up to now.  I mean, she gave the

9   names or --  I don't know up to now.  I wrote the letters

10  up to now.  I have been observed by several people.

11      Q.      So these people would come in to observe the

12  classroom?

13      A.      To come to the classroom.  I don't know, I've

14  seen a lot of people coming back and forth.

15      Q.      Approximately how many people?

16      A.      Two or three times there were five people

17  together, including her.

18      Q.      What would these five people do when they came

19  into the classroom?

20      A.      They came, they observed, they looked, see, talk

21  to the children.

22      Q.      This happened two or three times?

23      A.      Yes, five people.

24      Q.      But you don't know who the five people were?

25      A.      One was Mr. O'Brien and one was, I think is Tim

Y. JEAN-BAPTISTE

1    Behr.

2        Q.      Who is Mr --

3        A.      And I don't recall the other names.

4        Q.      Who is Mr. O'Brien?

5        A.      He was a former deputy, he was a former deputy

6    superintendent.  And I think now he is working for the

7    school as a consultant.

8        Q.      Who was Tim Behr?

9        A.      I heard he still works for the DOE, the

10   Department of Education, yes.  But the other two people, I

11   don't know who they are.

12       Q.      These five people, do you know if they went to

13   other classrooms, too?

14       A.      I don't know because I am in the classroom.

15       Q.      You said two or three times, was this two or

16   three times a year or two or three times total?

17       A.      This past beginning -- like February 2008, yes.

18       Q.      So two or three times?

19       A.      I think in February and in March, yes.

20       Q.      Had this ever happened before?

21       A.      You mean with these people?

22       Q.      Yes.

23       A.      No.

24       Q.      Now you also said that Dr. Koski would come into

25   your room all the time, can you just describe what you mean

Y. JEAN-BAPTISTE

1   by that?

2      A.     I mean, since I am in the room, I mean, I am

3   working with the children, yes.  It was very frequently she

4   used to come.  And sometimes she would come, she used to

5   come with a pad, write and leave, yeah.

6      Q.     How many times is "very frequently," over the

7   course of a month?

8      A.     There are some, some months --  I mean, there are

9   sometimes, like, you have to break it down.  There are some

10   months --  I could say in a month, maybe five or six times.

11   Like in a week, maybe two times.  One time in the morning

12   and then one time in the afternoon with the AP.

13      Q.     What would she do when she would come into the

14   classroom?

15      A.     She come, she look.  Sometimes she ask the

16   children questions to explain what they are doing.

17      Q.     Approximately how long would she stay in the

18   classroom when she'd do this?

19      A.     Sometimes ten minutes, fifteen.  You're talking

20   about in general or are you talking --

21      Q.     Just in general.

22      A.     From when I started to --

23      Q.     Yes.

24      A.     Oh, when I started she, yes, she used to come and

25   ask the children if they understand what I am doing.  If

Y. JEAN-BAPTISTE

1    A.    I don't know, I don't recall.  I don't recall.

2              MR. WIMS: I will ask you to clarify,

3         Counselor.

4              Are you asking how long the meetings would

5         last or over what period of time?

6    Q.    Over what period of time did you have to meet

7    with her once a week; was it for the whole school year, was

8    it for one semester?

9    A.    I think it was one semester, yeah.

10   Q.    Now I am going to ask you the same questions that

11   we just went through with Dr. Koski about Mrs. Gershman.

12   You also allege Mrs. Gershman --  Actually, before we move

13   to Mrs. Gershman.

14             The things that you described Dr. Koski did that

15   were harassing to you, why do you think she did these

16   things?

17   A.    Yes.  Why do I think she was harassing me?

18   Q.    Yes.

19   A.    To get me out of the school.

20   Q.    Why do you think that?

21   A.    Because I was never wanted, I was never wanted in

22   the school.

23   Q.    Why do you think you were never wanted in the

24   school?

25   A.    I don't know.

Y. JEAN-BAPTISTE

1      A.      The union, that is my recourse.  The union, that

2  was who I was supposed to report to, to the union.  I used

3  to send them letters.

4      Q.      Do you think that Dr. Koski harassed you because

5  of your race?

6      A.      Yes, my national origin.

7      Q.      Why do you think that?

8      A.      Why?

9      Q.      I guess, why do you think that it was because of

10  your national origin?

11      A.      Yes.  I mean, what made me think that way?

12  Because why is the reason I have been having a lot of --  I

13  was under a lot of stress and under a lot of emotional

14  stress and that is the reason.  Because for no reason I was

15  --  I mean, I always carried myself as a professional.  I

16  go there and work with the children and to go over all

17  these things, that is, I don't --  I have never

18  disrespected anyone.  I always carried myself as a

19  professional.  I go there on time and do my work.

20          And I can do my work and I have been.  I got a

21  lot of very commendable letters, but I don't see why almost

22  for the entire time I had been under a lot of pressure,

23  yes.

24      Q.      Under pressure from who?

25      A.      From who?  From the administration.

Y. JEAN-BAPTISTE

1    was, I mean, it is.

2        Q.    Do you believe that Mrs. Gershman harassed you

3    because of your race?

4        A.    Yes.

5        Q.    Why do you think that?

6        A.    Why do I think that? Why do I think that? It

7    happened. It happened.

8        Q.    But why do you think it happened because of your

9    race?

10       A.    Why? I mean, because of my race it happened.

11   But I can't, I mean, how could I describe that because of

12   my race she did all these things. Because I had never done

13   anything to them to treat me in that manner.

14       Q.    Do you think that she harassed you because of

15   your national origin?

16       A.    National origin, my race, yes.

17       Q.    Why do you think that she harassed you because of

18   your national origin?

19       A.    She harassed me because of my national origin

20   because I had never done anything to them, you know, in

21   order for them to treat me in that manner.

22       Q.    Now we talked a little bit about this before

23   because you allege in your complaint that you were

24   subjected to these unannounced visits by Mrs. Gershman and

25   Dr. Koski. This is kind of what we talked about before.

Y. JEAN-BAPTISTE

1    A.      I don't know why.

2    Q.      Did she say why she wanted to look at them?

3    A.      I guess to see if they were correct.

4    Q.      What type of meeting were you having with her

5    when she asked to see the notebooks?

6    A.      I don't know.  She wanted to see if the other

7    children, if I was giving the children correct work or

8    something like that.

9    Q.      Was this a scheduled meeting that you were having

10   with her?

11   A.      No, just, just called me to come, yes.  "Come and

12   bring your lesson plan book" or something, something like

13   that, yes.

14   Q.      When was that?

15   A.      That was year 2004 and 2005, that school year.

16   Q.      Were there any other times when she wanted to

17   look at the students' notebooks or work assignments?

18   A.      Um, it was, it was quite often she used to come

19   and do that.

20   Q.      I know you said they would come into the

21   classroom and look at the children's work, but were there

22   any other times when you were meeting with her and she

23   would then call to have the students bring down their

24   notebooks?

25   A.      I think that happened two or three times, yes.

Y. JEAN-BAPTISTE

1      Q.      Do you know if she looked at the assignments, the

2   students' assignments for any other teachers?

3      A.      That, I have -- I don't know.

4      Q.      Did you ever complain to anybody that she was

5   looking at your students' assignments --

6      A.      In the school?

7      Q.      I'm sorry?

8      A.      In the school?

9      Q.      Or to anybody?

10     A.      What do you mean, a friend or --

11     Q.      Did you ever complain to the union?

12     A.      Yes, it was something that was going on.  It's in

13  the log, yes.

14     Q.      It is something that was ongoing?

15     A.      Ongoing, ongoing, yes.

16     Q.      Do you think that she was looking at your

17  students' assignments because of your race?

18     A.      Race, national origin, yes.

19     Q.      Why do you think that?

20     A.      Why do I think that?  Because of the treatment

21  that I was getting, that is what, yeah.  The treatment I

22  was getting.  Because that never, that never happened to me

23  in any other school, it is only at P.S. 26.

24          Since the beginning I wasn't wanted.  Before I

25  arrived at the school she called me, I believe, in May or

Y. JEAN-BAPTISTE

1      A.      It is Educational something.  I mean, but it is

2  every year, twice a year.  And then that part, she was here

3  to do the, the reading.

4      Q.      She had to do the --

5      A.      She was reading, but like it was for reading

6  speed and accuracy and she was a little bit nervous.  And I

7  said, "oh."  I said, "oh," that part.  But I just said, I

8  used the term, I said, and I said, "oh, you didn't pass the

9  test."  I said, "let's calm down, relax.  I am going to

10 give it to you again."  And then I gave it to her again and

11 then she passed.  And I said, "see, I told you."  And then,

12 I don't know, she went.

13          And then one time I got a letter from the mother.

14 She said I told her daughter that she didn't pass her test.

15 And then they called me in the office to tell me that I

16 was, I didn't speak to the child.  I explained to them what

17 happened.

18          But when the mother sent me the letter, I called

19 the mother.  I called the mother and I talked to her.  I

20 said --  The mother said, "well, you know, she just told me

21 she didn't pass."  And I said, "no, she passed."  It is

22 just, it is an assessment, it is just a way to say it.  But

23 I gave it back to her again right away and she did it well.

24 And I said, "would you like to come to see it?"  She said,

25 "no, I can wait for the parent teacher's conference, that

Y. JEAN-BAPTISTE

1    is okay."

2              Then the next day or the following week they

3    called me to come to the office to talk about that and they

4    wrote something in the counseling memo.  I mean, the

5    counseling memo, yes.

6        Q.    Who was at this meeting?

7        A.    Dr. Koski.  I believe Mrs. Gershman was there and

8    --  Mrs. Gershman and Mrs. Goodman were there, were

9    present.

10       Q.    When did this occur?

11       A.    That is the 2004-2005, yes, school year.

12       Q.    Why did you say they tried to accuse you of

13   abusing this child?

14       A.    That is what they were doing.  Like the child is,

15   that I told the child she didn't pass the test.

16       Q.    Did Dr. Koski ever say that she was accusing you

17   of abusing, did she use that word?

18       A.    Well, I mean, there has been so many things and

19   it's been so long.  There is a lot of things, but it has

20   been five years.  The same thing, same thing.  I mean, it

21   is not -- I mean, I wrote that down, but I can't recall

22   every detail in the thing, yes.

23             And that thing bothered me because I knew that

24   wasn't the intention.  I didn't see why -- I mean, how many

25   times?  All I said, "let's see, let's do it better.  Let's

Y. JEAN-BAPTISTE

1    do it well."  I think I am not the only teacher who can

2    tell her let's go back and redo it.  But for me to get a

3    letter and then even after I spoke with the mother.

4            And then for the principal at the administration

5    to call me and start to make that thing big and then write

6    me, like, a counseling memo that, I mean, to put in my

7    file, yes.

8    Q.     And --

9    A.     Excuse me.  And the cycle of having to go to the

10   office all the time.  For any little thing I was in the

11   office, yes.

12   Q.     Do you still have a copy of the letter that the

13   parent sent to you?

14   A.     I don't think so.  If -- I don't think so.

15   Q.     Do you think that you were called to the office,

16   as you say all these times, because of your race?

17   A.     Race and national origin, yes.  And I was, I

18   never, they never wanted me in the school from before I

19   arrived at the school.

20   Q.     Why do you think it was because of your race and

21   national origin?

22   A.     Why should it?  I mean, why?  Why was I treated

23   that way?  I mean, I never did anything to the people.  I

24   showed respect.  I show respect to anyone and I carry

25   myself in a professional manner and to be treated like

Y. JEAN-BAPTISTE

1        that.  That wasn't the first school.  I mean, I have been

2        working for other schools.

3                       MS. O'CONNOR: Okay, this is a good time for

4                       a restroom break.

5                       (Whereupon, a short recess was taken.)

6        Q.      Ms. Jean-Baptiste, your complaint also alleges

7        that you were ordered to submit to numerous and unwanted

8        medical examinations.

9        A.      Yes.

10       Q.      Can you describe what you mean by these medical

11       examinations?

12       A.      To go to the medical bureau at 65 Court Street.

13       Q.      That is the DOE medical division?

14       A.      Yes.

15       Q.      How many times did you go to that medical

16       division?

17       A.      Two times.

18       Q.      Do you recall when those times were?

19       A.      One was right after my --  One was in October

20       2006 and the other one was in March 2007.

21       Q.      Why do you think that these medical examinations

22       were unwarranted?

23       A.      Why?

24       Q.      Yes.

25       A.      Because I have my doctor's note and my doctor's

Y. JEAN-BAPTISTE

1     A.    Yes.

2           MS. O'CONNOR: Okay, mark this, please.

3           (Whereupon, the aforementioned application

4           for sabbatical was marked as Defendant's Exhibit

5           H for identification as of this date by the

6           Reporter.)

7     Q.    I am handing you what the Court Reporter has

8     marked as Defendant's Exhibit H; do you recognize that

9     document?

10    A.    Yes.

11    Q.    What is it?

12    A.    This is, I think it is a form, I don't know, from

13    the doctor.  Let me see.  The application for sabbatical.

14    Q.    That is your signature on it?

15    A.    Yes.

16    Q.    You submitted this form for a leave of absence?

17    A.    Yes.

18    Q.    That leave of absence was granted?

19    A.    Yes.

20    Q.    How long was that leave of absence?

21    A.    From February 1st, 2006 through July 31st, 2006.

22    Q.    Why did you request that leave of absence?

23    A.    The doctors requested I stay out of work, yes.

24    Q.    What doctors requested that you stay out of work?

25    A.    I think Dr. Tavakoli sent this thing about -- let

Y. JEAN-BAPTISTE

1    me see.  Hypertension.  And Dr. Clerisme sent his note to

2    the medical office.

3        Q.    After your leave of absence, so I guess it would

4    be the 2006-2007 school year, did you return to P.S. 26 in

5    September of '06?

6        A.    Yes.

7        Q.    Were you teaching second grade?

8        A.    No.  Then I was assigned to kindergarten.

9              MS. O'CONNOR: Sorry.  Could you also mark

10             this.

11             (Whereupon, the aforementioned doctor's note

12             was marked as Defendant's Exhibit I for

13             identification as of this date by the Reporter.)

14       Q.    I am handing you what the Court Reporter has

15    marked as Defendant's Exhibit I.  Just take a second and

16    look that over.

17             Do you recognize what that is?

18       A.    Yes, I recognize that.

19       Q.    What is it?

20       A.    A letter that I was out, yes.  And then whatever

21    the doctor --  Yeah, yes, whatever the doctor stated.  And

22    I was out for a week.

23       Q.    Did you submit that doctor's note to Dr. Koski?

24       A.    Yes, yes.

25       Q.    That note indicates that you would be expected to

Y. JEAN-BAPTISTE

1    resume your duties on October 2nd, correct?

2         A.      Yes.

3         Q.      Did you come back on October 2nd --

4         A.      Yes, yes.

5         Q.      -- to the kindergarten class?

6         A.      Yes.

7         Q.      Did there come a time in this 2006-2007 school

8    year when you were transported from the school to the

9    hospital by ambulance?

10        A.      Yes.

11        Q.      Can you describe what happened then on that day?

12        A.      Okay.  On that date, during, I think during I

13   went to drop the children at the cafeteria, on my way I

14   usually check my mailbox.  And I went there, I picked up a

15   letter of disciplinary action and I took the letter, I put

16   it in my bag.

17              Then, while I was sitting down correcting the

18   children's homework, I saw that the ceiling was turning

19   (indicating).  And I sat back, I was looking straight

20   somewhere and I managed to go, I was tumbling, to go to the

21   nurse's office.  Because I was on the first floor, the

22   nurse's office was on the, close, like across from my room.

23        Q.      Yes.

24        A.      Yes.  And then when I got there, the nurse took

25   my blood pressure.  And my pressure was 172 something and

Y. JEAN-BAPTISTE

1  the nurse made the determination for me to go to the

2  hospital.

3      Q.      What happened next?

4      A.      And what happened next?  The ambulance came to

5  pick me up and I went.  And I when I was there, my pressure

6  was 156 and they told me to go and see the doctor, that is

7  the emergency room doctor.  And then I go see Tavakoli and

8  then I go and see Dr. Clerisme.

9      Q.      Have you ever gotten dizzy like this before?

10     A.      The day before I got up to come to work and then

11  I started feeling dizzy and then I called, I called the

12  principal.  I said, "I am not feeling well, but I am going

13  to be late if I feel better."  And then I felt better and I

14  got to the school late.  And I brought a note to tell her

15  that, yes.

16             MS. O'CONNOR: Mark this, please.

17             (Whereupon, the aforementioned incident

18             report was marked as Defendant's Exhibit J for

19             identification as of this date by the Reporter.)

20     Q.      Ms. Jean-Baptiste, I am handing you what the

21  Court Reporter has just marked as Defendant's Exhibit J.

22  Just take a second and look that over.

23     A.      Yes.

24     Q.      What is that?

25     A.      That is the same thing that happened that day.

Y. JEAN-BAPTISTE

1    February '06 to July of '06, have you taken any other leave

2    of absence?

3        A.      This, this, this year, yes.

4        Q.      When was that from?

5        A.      From June -- No, it started from May, May 2008

6    to June 30th, 2008.

7        Q.      Why did you request that leave of absence?

8        A.      It is a leave of absence without pay because of

9    the same problem, sleeping again.  Sleeping while I was

10   teaching, I mean, in the classroom.  And I almost run into

11   a car and have an accident because I was sleeping behind

12   the wheel.  So the doctor, I told the doctor, he asked me

13   to see him so he can adjust my medication, yes.

14       Q.      You said you were falling asleep in the

15   classroom?

16       A.      Yeah.  Sometimes I was kind of dozing, yes.  And

17   I --

18       Q.      Were the children in the classroom?

19       A.      What?

20       Q.      Were the children in the classroom?

21       A.      Yes.

22       Q.      So this leave of absence was just for May of '08

23   and June of '08, correct?

24       A.      Yes.

25       Q.      Will you be returning to P.S. 26 come September

Y. JEAN-BAPTISTE

1    of '08?

2       A.      Since I am in Florida now --

3       Q.      Yes.

4       A.      -- I, I don't know.  I don't, I don't know yet.

5    I may resign.

6       Q.      Did you ever file a complaint with DOE's internal

7    office Equal Employment Opportunity?

8       A.      Yes, I did.

9       Q.      When did you file that complaint?

10      A.      I don't recall, but between, I think year 2004 or

11   2005, I believe.

12      Q.      Do you recall what you said in that complaint?

13      A.      I don't recall.  I mean, they have the form.  I

14   just filled it out and sent it to them.

15      Q.      What was the outcome of that complaint?

16      A.      They said they didn't find anything.  Something

17   like that, I believe, yes.

18      Q.      That's the DOE's internal office --

19      A.      Yes.

20      Q.      When you say "they didn't find anything," what do

21   you mean; they didn't find anything means what?

22      A.      It was that they didn't find any, any

23   discrimination, that is what they told me.

24      Q.      Did you ever file a complaint with the State

25   Division of Human Rights?

**Exhibit B**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
YVROSE JEAN-BAPTISTE,

                       Plaintiff,

           -against-

NYC DEPARTMENT OF EDUCATION,
DINA KOSKI, Officially and Individually,
DEBRA GERSHMAN, Officially and Individually

                      Defendants.
-----------------------------------------------------------X

Civil Action No.: 07CV3535
(FB)(CLP)(ECF)
**FIRST AMENDED
COMPLAINT**

JURY TRIAL DEMANDED

**PLEASE TAKE NOTICE** that Plaintiff by her attorney, **DAVID C. WIMS**, amends her complaint by Court order and stipulation of the parties, and alleges as follows:

**JURISDICTION AND VENUE**

(1) This action is brought to remedy discrimination on the basis of race, color and/or national origin in the terms, conditions and privileges of employment and to remedy retaliation against an employee for activity protected under Title VII and similar laws all in violation of, Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII"), the Civil Rights Act of 1866, 42 U.S.C. § 1981, as amended ("1981"); the New York State Human Rights Law ("NYSHRL")  and the NYC Human Rights Law ("NYCHRL").

(2) Injunctive and declaratory relief, damages and other appropriate legal and equitable relief are sought pursuant to 42 U.S.C. § 2000e (f) and (g), 1981, the NYSHRL and the NYCHRL.

(3) Plaintiff Yvrose Jean-Baptiste ("Jean-Baptiste" or "Plaintiff"), dual filed a charge of discrimination against Defendants DOE, Koski and Gershman, with the New York State

1

Division of Human Rights ("DHR") and the Equal Employment Opportunity

Commission ("EEOC") on or about June 2005, complaining of the acts of race, color and

national origin discrimination alleged herein.

(4) On June 7, 2007, more than 180 days having elapsed since the filing of her charge, the

EEOC issued plaintiff a notice informing her of her right to sue Defendants in federal

court. (Attached as Exhibit "A")

(5) Plaintiff has complied fully with all prerequisites to jurisdiction in this Court under

Title VII. Jurisdiction of the Court is proper under § 706(f)(3) of Title VII, 42 U.S.C. §

2000e-5(f)(3) and 28 U.S.C. § 1331. Supplemental jurisdiction of the claims under the

NYSHRL and NYCHRL is invoked pursuant to 28 U.S.C. § 1367.

(6) As the unlawful employment practices complained of herein occurred within the

Eastern District of New York, venue is proper in this District pursuant to § 706(f)(3) of

Title VII, 42 U.S.C. § 2000e-5(f)(3) and 28 U.S.C. § 1391(a).

## PARTIES

(7) Plaintiff, a black, female of Haitian descent and a resident of the State of New York,

has been and is employed by the New York City Department of Education ("DOE") for

over seventeen (17) years as a school teacher. She has worked at various schools in

varying capacities and currently at P.S. 26 in Fresh Meadows, NY.

(8) Defendant DOE, upon information and belief, is a public entity duly organized and

existing under the laws of the State of New York. Defendants Dina Koski and Debra

Gershman, at all times herein relevant, are and were the Principal and Assistant Principal,

respectively, of P.S. 26. Defendants Koski and Gershman are sued in both their official

2

and individual capacities.

**ALLEGATIONS COMMON TO ALL CAUSES OF ACTION**

(9) Plaintiff was hired by DOE as an Early Childhood Teacher in 1990, and at all times herein relevant possessed permanent certification thereof. Pursuant to an integration policy of DOE, and as a result of a racial imbalance in the staff of Defendant P.S. 26, on or about May 2003, she was transferred to Defendant P.S. 26 in part to provide racial balance to the school's staff. Throughout her employment with DOE, Plaintiff distinguished herself professionally, and in fact was never disciplined nor reprimanded for anything of substance prior to her tenure at P.S. 26.

(10) Just prior to Jean-Baptiste's arrival, Defendant Koski called her to persuade her not to accept the transfer. Shortly after Jean-Baptiste transferred to P.S. 26, Defendants Koski and Gershman (collectively, "supervisors") subjected her to race, color and/or national origin disparate treatment and harassment, including refusing to assign her appropriately, frequent unannounced observations, inspecting her students' assignments and character assassination, *inter alia*. Similarly situated, white comparators were not treated this way by Defendants.

(11) Specifically, after the commencement of Plaintiff's tenure at P.S. 26, Defendants supervisors placed a white teacher with less seniority and no relevant certification in an available Early Childhood Education classroom assignment rather than Plaintiff; assigned Plaintiff to perform as a substitute teacher notwithstanding her greater credentials, licensure and experience than a similarly situated white comparator who was assigned an Early Childhood Education classroom; assigned Plaintiff as a "paraprofessional" to assist

3

a white teacher with less seniority and no relevant certification; and assigned Plaintiff manual and clerical duties not assigned to similarly situated white comparators (12) This was done notwithstanding departmental and other relevant guidelines on assignment and seniority.

(13) Supervisors also summonsed Plaintiff to their office over thirty (30) times in attempts to impose discipline for trivial matters, ordered her to submit to numerous, unnecessary medical and psychological evaluations, and made defamatory statements about Plaintiff on numerous occasions to P.S. 26 students, parents and staff, *inter alia*. Similarly situated, white comparators were not treated this way by Defendants.

(14) Jean-Baptiste made numerous complaints about her supervisors' harassment to Defendants Koski and Gershman and to DOE's Office of Equal Opportunity, to no avail. She also filed numerous complaints with her labor organization, seeking to cease the supervisors' behavior.

(15) Plaintiff, however, then began to suffer the effects of having complained about the harassment. Despite the fact that she was highly qualified for the position, she was subjected to intense scrutiny by her supervisors.  This included frequent unannounced classroom "visits" and "evaluations", and retaliatory written evaluations, *inter alia*.

(16) Plaintiff's grievances about her supervisors' conduct were often heard in the first instance by Defendant Koski.

(17) On or about November 2005, Plaintiff took leave from work due to conditions caused or exacerbated by the harassment.  She was subsequently deemed unable to return by her medical providers and took health sabbatical in January 2006.

4

She has since returned and the complained of behavior currently persists.

(18) Because of the continuing, severe and pervasive pattern of discrimination and retaliation, Jean-Baptiste continues to suffer adverse health effects, emotional distress and lack of satisfaction and enjoyment of her career, *inter alia*.

## FIRST CAUSE OF ACTION

(19) Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 18 of this Complaint with the same force and effect as if set forth herein.

(20) Defendants DOE, Koski and Gershman have discriminated against Plaintiff in the terms and conditions of her employment on the basis of her race, color and/or national origin in violation of Title VII, the NYSHRL and the NYCHRL.

(21) Plaintiff is now suffering and will continue to suffer irreparable injury and monetary damages as a result of defendant's discriminatory practices unless and until this Court grants relief.

## SECOND CAUSE OF ACTION

(22) Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 21 of this Complaint with the same force and effect as if set forth herein.

(23) Defendants DOE, Koski and Gershman have retaliated against Plaintiff on the basis of her having complained of discrimination, in violation of Title VII, 1981, the NYSHRL and the NYCHRL.

(24) Plaintiff is now suffering and will continue to suffer irreparable injury and monetary damages as a result of defendant's retaliatory practices unless and until this Court grants relief.

5

**THIRD CAUSE OF ACTION**

(25) Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 24 of this Complaint with the same force and effect as if set forth herein.

(26) The above acts and practices of Defendants DOE, Koski and Gershman constitute unlawful discriminatory practices within the meaning of the Civil Rights Act of 1866, 42 U.S.C. § 1981, as amended.

(27) As a result of Defendant's discriminatory acts, plaintiff has suffered and will continue to suffer monetary damages and damages in the form of mental anguish and humiliation unless and until this Court grants relief.

**FOURTH CAUSE OF ACTION**

(28) Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 27 of this Complaint with the same force and effect as if set forth herein.

(29) Defendants DOE, Koski and Gershman violated Plaintiff's due process rights as embodied in the Constitution of the United States, Amendment XIV, as made applicable to them by 42 U.S.C. § 1983; and in the Constitution of the State of New York.

(30) As a result of Defendant's discriminatory acts, Plaintiff has suffered and will continue to suffer monetary damages and damages in the form of mental anguish and humiliation unless and until this Court grants relief.

**FIFTH CAUSE OF ACTION**

(31) Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 30 of this Complaint with the same force and effect as if set forth herein.

(32) Defendants DOE, Koski and Gershman violated Plaintiff's equal protection rights as embodied in the Constitution of the United States, Amendment XIV, as made applicable to them by 42 U.S.C. § 1983; and in the Constitution of the State of New York.

(33) As a result of Defendant's discriminatory acts, Plaintiff has suffered and will continue to suffer monetary damages and damages in the form of mental anguish and humiliation unless and until this Court grants relief.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff respectfully requests that this Court enter a judgment:

(a) Declaring that the acts and practices complained of herein are in violation of Title VII, 1981, the NYSHRL and the NYCHRL;

(b) Enjoining and permanently restraining these violations;

(c) Directing defendant to take such affirmative action as is necessary to ensure that the effects of these unlawful employment practices are eliminated and do not continue to affect Plaintiff's employment;

(d) Awarding Plaintiff compensatory and punitive damages;

(e) Awarding Plaintiff the costs of this action together with reasonable attorneys' fees, as provided by § 706(k) of Title VII, 42 U.S.C. § 2000e-6(k);

(f) Granting such other and further relief as this Court deems necessary and proper.

7

**DEMAND FOR A TRIAL BY JURY**

**Pursuant to <u>Rule 38(b) of the Federal Rules of Civil Procedure</u>, Plaintiff demands a trial by jury in this action.**

Dated:  Brooklyn, New York

January 24, 2008

LAW OFFICE OF DAVID WIMS
David C. Wims, Esq. (DW-6964)
Attorney for Plaintiff
1430 Pitkin Ave., 2nd Floor
Brooklyn, NY 11233
(646) 393-9550

8

**Exhibit C**

RE: II. INTEGRATION TRANSFERS FOR SEPTEMBER 2003-PAGE 18

NEW YORK CITY DEPARTMENT OF EDUCATION☐ DIVISION OF HUMAN RESOURCES

## APPLICATION #1 FOR TRANSFER TO FURTHER INTEGRATION

READ INSTRUCTIONS CAREFULLY BEFORE COMPLETING ALL ITEMS LISTED BELOW. PLEASE PRINT CLEARLY. APPLICATION MUST BE HAND DELIVERED TO EIGHTH FLOOR, 65 COURT STREET, BROOKLYN, NEW YORK, BY DEADLINE DATE. FAX OR MAIL SUBMISSIONS WILL NOT BE PROCESSED. IMPORTANT NOTE: Applicants are asked to be aware that the September 2003 budget condition may impact upon the actual availability of some transfers granted.

CHECK HERE IF ALSO SUBMITTING APPLICATION #2 PURSUANT TO ARTICLE 5G [  ]
CHECK HERE IF REQUESTING SHORTAGE AREA TRANSFER [  ]

I) NAME: (Last, First, MI) JEAN-BAPTISTE, Yrose          FILE#: 666324

DISTRICT 28          BOROUGH Q          SCHOOL 117

II) LICENSE E.C.          CURRENT RULE 3 LICENSE:

III) RULE 3 LICENSE (only if attaining Rule 3 status by end of the present school year): I have attached documentation verifying Rule 3 service. [  ] yes (N.B.: Does not apply to high school teachers) –See Instructions and complete Rule 3 form on reverse.

IV) SCHOOLS TO WHICH TRANSFER IS REQUESTED ( IN ORDER OF PREFERENCE). See instructions.
(Note: Limited to a total of six choices combined on both applications per applicant.)

|   | DISTRICT | BORO | SCHOOL | SUBJECT AREA |
|---|----------|------|--------|--------------|
| 1. | 26 | Q | 05261 | Early Childhood |
| 2. | 26 | Q | 98 | Early Childhood |
| 3. |    |   |        |              |
| 4. |    |   |        |              |
| 5. |    |   |        |              |
| 6. |    |   |        |              |

V) ETHNIC IDENTIFICATION: In order to apply for a Transfer to Further Integration, you must enter an "X" in one of the following boxes:

AMERICAN INDIAN OR ALASKAN NATIVE ☐          HISPANIC ☐
ASIAN OR PACIFIC ISLANDER ☐          WHITE (Not of Hispanic Origin ☐
BLACK (Not of Hispanic Origin) ☒

TEACHER'S SIGNATURE: Yrose Jean-Baptiste          PRINCIPAL'S SIGNATURE: Helen Santner

VI) I UNDERSTAND THAT IF ANY INFORMATION OR DOCUMENTATION PROVIDED AS PART OF THIS APPLICATION IS FOUND TO BE MISSING, FRAUDULENT, FORGED OR ALTERED, IT WILL RESULT IN REJECTION OF THE APPLICATION AND MY BEING RETURNED TO MY FORMER SCHOOL AND MAY RESULT IN DISCIPLINARY ACTION.
TEACHER'S SIGNATURE: Yrose Jean-Baptiste          DATE: 5/15/03

'03 MAY 16 P4:16

INTEGR #1

**Exhibit D**

1

2    UNITED STATES DISTRICT COURT EASTERN
     DISTRICT OF NEW YORK
3    ------------------------------------------X
     YVROSE JEAN-BAPTISTE,
4
                                    PLAINTIFF,
5
              -against-    Civil Action No.:
6                              07CV3535

7    NYC DEPARTMENT of EDUCATION, DINA KOSKI,
     OFFICIALLY AND INDIVIDUALLY, DEBRA
8    GERSHMAN, OFFICIALLY and INDIVIDUALLY,

9                                    DEFENDANTS.
     ------------------------------------------X
10

11                  DATE: August 5, 2008

12                  TIME: 11:15 a.m.

13

14

15              EXAMINATION BEFORE TRIAL of the

16   Defendant, DINA KOSKI, taken by the

17   Respective Parties, pursuant to a Court

18   Order, held at the office of David Wims,

19   1430 Pitkin Avenue, Brooklyn, New York

20   11233, before QUINTINA HASKINS, a Notary

21   Public of the State of New York.

22

23

24

25

1

2    A P P E A R A N C E S:

3

4    LAW OFFICE of DAVID WIMS
        Attorney for the Plaintiff
5      YVROSE JEAN-BATPISTE
        1430 Pitkin Avenue, 2nd Floor
6      Brooklyn, New York 11233
        BY:   DAVID C. WIMS, ESQ.

7

8

9    MICHAEL A. CARDOZO, ESQ.
     CORPORATION COUNSEL
        Attorney for the Defendants
10    NYC DEPARTMENT of EDUCATION, DINA KOSKI
        and DEBRA GERSHMAN
11    100 Church Street
        New York, New York 10007
12    BY:   ANDREA M. O'CONNOR, ESQ.
        File #: 2007-028228

13

14

15

16
                    *           *           *
17

18

19

20

21

22

23

24

25

```
1                         KOSKI
2          Q.     Was that pursuant to an
3    integration transfer?
4          A.     Yes.
5          Q.     Can you tell me what that
6    means, please?
7          A.     An integration transfer is the
8    transfer that the United Federation of
9    Teachers and Board Of Education allowed at
10   that time; it's no longer in effect.  It's
11   to racially balance your school and staff
12   and students.  So, we needed to integrate
13   our school at that particular time.  An
14   Afro American teacher had retired and we
15   were replacing an African American teacher.
16   It's done through Central Board, we have
17   nothing to say about it.
18         Q.     Were you aware of why your
19   school was subject to the integration
20   transfer?
21         A.     No.  We knew that we were on
22   the list, we didn't know a reason.  We
23   didn't know where the inequality was.
24         Q.     When you say where the
25   inequality was; you mean.
```

```
 1                         KOSKI
 2        Q.    Would you have veto power over
 3    that?
 4        A.    No.
 5        Q.    Would you as the principal of
 6    P.S. 26 have the ability to assign an
 7    integration transfer to a position other
 8    than that, which they had applied for?
 9             MS. O'CONNOR:   Objection to
10         form.
11        Q.    Let me restate.  If a teacher
12    was assigned to your school pursuant to an
13    integration transfer, who decided where
14    that teacher were to be assigned?
15        A.    I did.
16        Q.    So, do you recall at what point
17    you were made aware that Ms. Jean-Baptiste
18    was going to be coming to your school?
19        A.    In June, before the close of
20    school.  I received notice from the human
21    personnel office.
22        Q.    Upon being made aware that
23    Ms. Jean-Baptiste was going to be
24    transferring to your school, did you call
25    to speak with her?
```

```
1                        KOSKI
2          A.    I called to speak with her,
3    just as I call every teacher that's being
4    invited to the school, who's been allowed
5    to transfer to the school to give them
6    their assignment in June as well as to make
7    them feel welcome.  I also allow them to
8    come in to pick up the books for the next
9    year and to prepare for their assignment.
10   Because many times they want to come in and
11   the buildings are closed during the summer
12   until the last week in August.
13         Q.    Do you recall the phone call
14   that you made to Ms. Jean-Baptiste?
15         A.    I remember speaking to her and
16   she was disappointed that she didn't have a
17   lower grade.  I didn't have a lower grade
18   available and so she was assigned to the
19   5th grade.
20         Q.    Did you ever attempt to
21   dissuade her from accepting assignment at
22   the school?
23         A.    No.
24         Q.    Were you aware of her
25   credentials at the time?
```

```
1                          KOSKI
2          A.    I only knew her file number.
3     And all I could pull up on the computer was
4     her file number and her experience, other
5     than that, I knew nothing.
6          Q.    You say you assigned her to the
7     5th grade?
8          A.    Yes.
9          Q.    On what basis was that?
10          A.    That was where I had a vacancy.
11    And my early childhood classes were all
12    filled with licensed teachers at the time,
13    teaching with a correct license; so, I had
14    no choice.
15          Q.    Early-childhood education is
16    what grades, Doctor?
17          A.    In those years, in 2003, it was
18    K to 2, kindergarten to 2nd grade.  Now,
19    it's first and 2nd grade.
20          Q.    Now it's 1st and 2nd, before it
21    was K through 2nd?
22          A.    Yes.
23          Q.    Do you recall the number of
24    early-childhood education classes that were
25    unfilled at the time?
```

```
1                    KOSKI
2    principal, depending on what grade it is.
3    My assistant principal supervised 5th
4    grade.
5         Q.    Did you have an opportunity, if
6    you recall, to observe Ms. Jean-Baptiste
7    teaching towards the beginning of her
8    tenure?
9         A.    I observed every teacher on the
10   first two days of school.  I go to every
11   classroom every day, so I did observe her
12   and everybody else.
13        Q.    So everyday you go to --
14        A.    We tour the building every day,
15   both my assistant principal and myself make
16   the rounds at least once every day.
17        Q.    How frequently do you evaluate
18   your staff?
19        A.    District policy was to observe
20   formally, and I will explain the
21   difference.  The new staff members twice a
22   year and informally, as many times as
23   necessary.  Daily we went informally to
24   every classroom.  New to the district and
25   new to the school receive two observations.
```

```
1                         KOSKI
2      It was a district policy at the time,
3      District 26.
4           Q.    Can you distinguish between
5      informal and formal?
6           A.    Informal observation.  Some
7      observing where there is a pre-observation
8      conference first and you work together on
9      the lesson.  The teacher brings to you the
10     lesson they plan, you review the lesson
11     that they plan and make any suggestions
12     which you hope they're implementing during
13     their lesson.  If necessary, they bring
14     back a revised plan.  If so, they go
15     forward and include what you've talked
16     about in the conversation and then
17     afterwards you have an evaluation.  You
18     have a conversation about what they did.
19     What was good, what was bad, what
20     suggestions you made and what help you can
21     offer them in order to, if necessary,
22     change or improve or refine is a better
23     word.
24          Q.    And, please describe an
25     informal observation?
```

1                        KOSKI

2          A.     You walk into a classroom, you

3     sit down, you watch what's going on.  If

4     it's -- we do it so often that our staff

5     and children are used to it.  You just go

6     in and watch.  If you see something

7     wonderful, you pass by and whisper in their

8     ear; boy, that was great.  If you see them

9     in the hall you comment.  It's informal,

10    just how it sounds.

11         Q.     Do you recall any problems that

12    you had with Ms. Jean-Baptiste towards the

13    beginning of that first year?

14         A.     She had difficulty controlling

15    her classroom.  Management was difficult

16    for her in the 5th grade.  And the

17    environment was not -- the classroom

18    environment the was not acceptable.

19         Q.     Can you, Dr. Koski, give me

20    some examples of her difficulty controlling

21    the classroom?

22         A.     Children weren't -- when I walk

23    in the room the children wouldn't be

24    listening to her.

25         Q.     What would they be doing?

```
 1                        KOSKI

 2        Q.     Do you recall --

 3        A.     No, I don't remember what I

 4   said to her.

 5        Q.     Do you remember what she said

 6   to you?

 7        A.     She told me she was an

 8   early-childhood teacher.  We offered her

 9   help.  At the time, I had a math coach and

10   a literacy coach.  I offered to have her

11   receive help and I offered for

12   Ms. Harmon, who was also new at our school,

13   to help her, because she had upper-grade

14   experience and it didn't help.

15        Q.     What grade was Ms. Harmon

16   assigned to?

17        A.     Ms. Harmon was assigned to no

18   grade the first few days of school because

19   she was a transfer.  Her job had been

20   disbanded and she was sent to my school.

21   She had been an adult educator as well as a

22   reading teacher and she was assigned to my

23   school by Mr. Peeples (phonetic) who was in

24   the region or by the region and she was

25   going to be in the classroom.  I had a
```

1                          KOSKI

2      pregnant teacher -- I had two pregnant

3      teachers that year, actually.  So, the plan

4      was that,

5      Ms. Jean-Baptiste was originally going to

6      stay in the 5th grade.  I had no intention

7      of moving her.  I didn't know they were

8      pregnant until they started showing.  I

9      then planned for her to take over 2nd grade

10     because she would have been back in

11     license.  And Ms. Harmon went back into the

12     5th grade and Ms. Jean-Baptiste went back

13     into the 2nd grade.  First she stayed with

14     Ms. Pavanno, who was leaving first.  And

15     Ms. Pavanno's class had been disbanded

16     because in October they recalculated the

17     registers and decided whether or not I

18     should lose a class or not.  I lost a

19     class, I remember that year.  So I also

20     lost a position.  So, she stayed with

21     Ms. Pavanno and then she went and team

22     taught with Ms. Coccaro, whose class she

23     took over.

24          Q.    When you say she stayed with

25     Ms. Pavanno, could you please tell me what

```
 1                          KOSKI
 2      you mean by that?
 3              A.      She team-taught.
 4              Q.      Her initial assignment was 5th
 5      grade?
 6              A.      Right.  And then she was moved.
 7              Q.      To 2nd grade?
 8              A.      Right.  And then what the plan
 9      was, that she then went to Ms. Coccaro to
10      be with her for a few weeks, to team-teach,
11      to learn her routine so that the children
12      would have a better adjustment to a new
13      teacher.  And Ms. Coccaro went and had her
14      baby and Ms. Jean-Baptiste went and took
15      over her class.
16              Q.      Which was second grade?
17              A.      Which was 2nd grade and was
18      within her license.
19              Q.      You indicated that, in response
20      to Ms. Jean-Baptiste difficulty controlling
21      her students that you offered a math and
22      literacy coach?
23              A.      Yes.
24              Q.      What were they supposed to
25      assist --
```

1                           KOSKI

2          A.     The role of the coach we have

3     them in the school for all teachers.  I

4     don't have them now, we don't have any

5     money.  But, at that time there was a math

6     coach and a literacy coach.  And their job

7     was to do staff development for all

8     teachers.  But when it implemented a new

9     math program called "Everyday Math," at

10    that time.  So, the math coach was working

11    with Everyday Math, as with all staff.  And

12    the literacy coach was working on readers

13    and writers workshops with all teachers new

14    to the buildings, new to their grades, new

15    to the school or having difficult so there

16    could be lots of reasons.  And then the

17    literacy coach also worked with a group of

18    children as well she worked with my

19    enrichment children.

20         Q.     What I'm not clear about is how

21    additional math or literacy assistance

22    would increase Ms. Jean-Baptiste's ability

23    to control her students.

24         A.     The first unit in the Teacher's

25    College America's Choice and Everyday Math

1                          KOSKI
2      is Rituals and Routines.  So that a math
3      and literacy coach could help her to set up
4      her routines in the classroom.  In other
5      words, to manage her children better.  If
6      there is a workshop model where there is a
7      mini-lesson where the teacher has all the
8      children working together, then they break
9      off and work individually and in small
10     groups with the teacher.  The coach could
11     help not only with the curriculum, but
12     could also help with the management, the
13     movement of the children, the paying
14     attention, what to say.  Everyday Math is
15     also a scripted lesson.  So, exactly how to
16     follow the program and for the readers and
17     writers workshop it's this movement.  How
18     to maintain records of children and know
19     where they are.  How to assess their needs,
20     how to maintain the other children while
21     you're reading with one child and things
22     like that.
23          Q.     Do they tend to float?
24          A.     Coaches, yes.
25          Q.     Now, you also indicated that at

1                           KOSKI
2      the beginning of Ms. Jean-Baptiste's
3      tenure, the classroom environment was not
4      acceptable.   In what way?
5           A.     The bulletin boards were not
6      appropriate, they were not completely
7      covered.   The classroom library was not set
8      up appropriately.
9           Q.     These are bulletin boards that
10     Ms. Jean-Baptiste composed or constructed?
11          A.     She hadn't constructed them was
12     the problem.   They were not covered, they
13     were not decorated, the room was not a
14     welcoming environment for children or
15     parents.
16          Q.     Is that usually what the
17     teachers who reported earlier do.
18          A.     They do it either beforehand or
19     many of my teachers work until 5:00 on
20     those two days.   If they don't come in for
21     so many days early, they stay very late to
22     complete them.
23          Q.     I didn't mean within the
24     context of the day.   You indicated that
25     most people came before the first day they

1                          KOSKI

2     procedure for checking student assignments?

3          A.    When we visit the classrooms,

4     we check student assignments.  If I've

5     reviewed a report card and I have a

6     question about a mark that was given on a

7     report card.  If I was surprised having

8     seen most of the students in class, if we

9     know the student and I've seen the report

10    card or have a question about it.  When we

11    visit classrooms, we look at student work

12    all the time.

13         Q.    Do you ever have students bring

14    their assignments to your office as opposed

15    to seeing them in class?

16         A.    Yes.

17         Q.    Understand what circumstances

18    does that occurred?

19         A.    Many times a child wants to

20    show us.  If not, if there has been parent

21    complaints we ask to see those children's

22    notebooks, folders, portfolios.

23         Q.    Do you recall if you had

24    parents make complaints about

25    Ms. Jean-Baptiste her first year?

1                              KOSKI

2          A.      Many.

3          Q.      Do you recall the nature of her

4    those complaints?

5          A.      First complaint that I remember

6    was about homework and the format for

7    homework and the fact that the assignments

8    were not clear.  Parents frequently

9    complained about the assignment itself.

10   They frequently complained about the fact

11   that homework was not often checked.  They

12   complained about, and I checked -- we have

13   what they call a home school notebook.

14   Every teacher maintains them with every

15   child.  Where a parent communicates back

16   and forth in this home school notebook.

17   So, if you want to write to me and tell me

18   that you're going to pick up your child at

19   12:00 instead of 2:00; you put it in the

20   home school notebook.  If I want to write

21   you to tell you that Johnny didn't do good

22   in school today, that's where I

23   communicate.  Or if I want to say Johnny

24   did a great job on his portfolio today,

25   that's where I communicate.  The complaint

1                           KOSKI
2    I got was that Ms. Jean-Baptiste never read
3    the notes and didn't respond to the
4    parents.  So I often would ask to spot
5    check them.  To see if their parents were
6    writing because that's their responsibility
7    as well as being answered by the teachers.
8         Q.    Have you received similar
9    complaints from parents about other
10   teachers?
11        A.    Not recently.  The first year
12   we had home school notebooks, yes.  But no
13   longer do I get complaints about that.  So
14   generally when a parent complaint comes in,
15   we generally meet with the parents and the
16   teacher because the letter of referral is
17   that the parent should have gone to the
18   teacher first.  It doesn't always happen.
19   So, when they come into my office, we have
20   a meeting, the three of us; parent, teacher
21   and myself and usually my assistant
22   principal and we solve the problem.
23        Q.    Were you able to solve the
24   problem of the many complaints that you had
25   about Ms. Jean-Baptiste that first year?

1                              KOSKI

2         A.      The first year I had a parent

3    who went to the superintendent and so I was

4    ordered to move the child out of her class.

5    And this past year I also couldn't solve

6    the problem and had three parents who

7    requested that their children be moved out

8    of the class.

9         Q.      They were moved to another

10   class in your school?

11        A.      Yes.

12        Q.      To your knowledge are those

13   students progressing without incident now?

14        A.      They're doing very well.   One

15   got into the gifted first grade class for

16   the next year.

17        Q.      Okay.   Did you feel that the

18   issues that you had with Ms. Jean-Baptiste

19   for the first year, her '03-'04 school year

20   were ones that would be resolved with

21   additional help?

22        A.      I was optimistic.

23        Q.      Why did you think that?

24        A.      I thought that she was a

25   professional, a mature woman and that with

1                          KOSKI

2    additional help, if she was willing to

3    receive the additional help, she was going

4    to succeed.

5          Q.    Now, five years later, do you

6    still think she's a professional?

7          A.    I think that some of her

8    behaviors were not professional, but I

9    think she's a professional.

10         Q.    And do you still think that

11   she's a mature woman?

12         A.    Of course.

13         Q.    Has she been able to succeed?

14         A.    She was rated as an

15   unsatisfactorily teacher this year.  Her

16   observations were unsatisfactory both

17   formal and informal.

18         Q.    She was rated unsatisfactory by

19   whom?

20         A.    Me.

21         Q.    Are you the sole person

22   responsible for that rating?

23         A.    I'm the rating officer for the

24   school.

25         Q.    How frequently do you do the

1                           KOSKI
2     ratings?
3          A.     Board of Ed procedure is that
4     teachers are rated once a year, they're
5     observed more than that.  I observed her,
6     my assistant principal observed her and we
7     had many informal observations.  And she
8     failed to make the changes we suggested
9     throughout the year and she failed to
10    uphold her -- she didn't teach as much as
11    she needed to teach and she wasn't as well
12    prepared as she needed to be.  I understand
13    she got sick.
14         Q.     This past school year, she was
15    rated as unsatisfactory.  The year before
16    that do you recall what she was rated as?
17         A.     She was rated a satisfactory
18    because she had been out ill and I felt it
19    was unfair to give her an unsatisfactory
20    rating for the year.  I felt that she had
21    been out, and I gave her the benefit of the
22    doubt.
23         Q.     The year before that; do you
24    recall?
25         A.     She had a satisfactory, but --

1                          KOSKI

2     and there was a satisfactory observation

3     and she was a tenure teacher so she was

4     only observed formally once.

5          Q.    So, this past year was the

6     first time?

7          A.    It's the first rating that she

8     got, not that she hasn't been

9     unsatisfactory.

10         Q.    First unsatisfactory rating

11    this year by you?

12         A.    Yes.

13         Q.    And you've done it again each

14    year that she was there; you were the

15    rating officer?

16         A.    Principals are always the

17    ratings officers.

18         Q.    Was the unsatisfactorily rating

19    she received this past year related to the

20    filing of this lawsuit?

21         A.    No.

22         Q.    You said that she didn't teach

23    much this past year; what did you mean by

24    that, Dr. Koski?

25         A.    She wasn't well prepared to

1                          KOSKI
2     teach within her classroom, so her children
3     were not receiving the instruction that
4     they needed to according to the standards
5     of the Board of Education.
6            Q.    I see.  Now is that evidenced
7     by grades?
8            A.    No.  As evidenced by visits to
9     classrooms, as evidenced by her refusal to
10    work with people who are trying to assist
11    her to improve her instruction, as
12    evidenced by parent complaints, as
13    evidenced by looking at student's work, as
14    evidenced by looking at student's results
15    at E-class, which is the test that
16    kindergarten children are given in January.
17    As evidenced by looking at, and I'll
18    explain it; a just write-book list.
19    Looking at the progress from one month to
20    the other and the readability of the
21    children, the levels those are the
22    evidences.
23           Q.    So, her students scored lower
24    on E-class than --
25           A.    Yes.

1                        KOSKI

2        Q.     Well, what I was going to say

3   was than students in other kindergarten

4   classes?

5        A.     Yes.

6        Q.     Were there any other factors

7   for this, the unsatisfactory rating this

8   past year in addition to those you just --

9        A.     She had excessive absences.

10       Q.     Okay.  So, that was a factor in

11  the unsatisfactory rating?

12       A.     Yes.

13       Q.     What's the approximate ratio

14  composition of your students, to the best

15  of your ability, please?

16       A.     60 percent Asian, 20 percent

17  Afro American, 5 or 8 percent Hispanic, and

18  the rest Caucasian, 1 percent Indian.

19       Q.     Is that India or Indian?

20       A.     No, American Indian.

21       Q.     Can you tell me the same

22  information for the teachers again, to the

23  best of your ability?

24       A.     I have to figure.  I'd have to

25  look at an organization sheet to tell you

1                          KOSKI

2    curriculums programs, etcetera; right?

3         A.    Yes.

4         Q.    Is it coincidence that she got

5    an unsatisfactory rating after the lawsuit

6    was filed?

7              MS. O'CONNOR:  Objection.

8         Q.    She had all of those problems

9    before she had the lawsuit; correct?

10        A.    Yes.

11        Q.    What was different after?

12        A.    I gave her multiple choices,

13   chances to improve.  And last year she

14   should have received an unsatisfactory

15   rating, however she was out sick last year.

16   So I was kind and gave her a satisfactory

17   rating.  She deserved an unsatisfactory

18   rating since her second year of teaching in

19   the building.

20        Q.    Let me just clarify.  When you

21   say last year, you mean two years ago?

22        A.    Two years ago, not this past

23   year.

24        Q.    '07-'08 is this past school

25   year?

```
 1                    KOSKI
 2     affects their emotional status.
 3          Q.    I see.  Does it affect their
 4     emotional status when their teacher takes
 5     maternity leave?
 6          A.    Yes.
 7          Q.    Did you question the validity
 8     of the contents of the doctor's notes
 9     Ms. Jean-Baptiste presented to you?
10          A.    No, I'm not a doctor.
11          Q.    Did you request additional
12     medical evaluation?
13          A.    Yes, by the Board of Education
14     to make sure that it was best for the
15     children for her to the return to school.
16          Q.    When you say best for the
17     children?
18          A.    If she was mentally ill or had
19     a mental illness, I wanted to make sure.
20     Since I'm not the doctor and I don't know
21     the ramifications of her diagnosis, I
22     wanted to have the Board of Education to be
23     able to determine whether or not she was
24     fit to return to her job.
25          Q.    Just to clarify.  When you say
```

```
 1                      KOSKI
 2   help, what was going on?  Why was I giving
 3   an unsatisfactory observation, why had I
 4   had a conference.  I had other teachers
 5   that I had conferences with.  So it was
 6   ongoing.  He was the person who was the
 7   next in line.
 8        Q.    Was there ever a time when her
 9   doctor said she could return to work and
10   you requested a medical examination?
11        A.    Only the time that she was
12   discharged from the hospital and said see a
13   psychiatrist.  Was the time we sent her for
14   medical.
15        Q.    Do you recall what year that
16   was?
17        A.    No.
18        Q.    Is Ms. Jean-Baptiste currently
19   at your school, to your knowledge?
20        A.    I received a letter from her
21   telling me that she was going to resign
22   effective August 28th.  So, as of today
23   she's on my organizational sheet until
24   August 28th.
25        Q.    Have you replaced her.
```

1                          KOSKI

2      coach and a literacy coach.  She repeatedly

3      refused for them to come in the classroom.

4      They have a set scheduled and whenever they

5      would go to her room, according to the

6      schedule, she would say no.

7          Q.    So, the math and literacy

8      coaches weren't schedule where they would

9      see all the teachers in the school?

10         A.    Very difficult, all different

11     teachers.  They generally worked with the

12     experienced teacher for six weeks, teachers

13     new to the grade or having difficulty could

14     be a longer period of time.

15         Q.    I believe you testified also

16     that at times she would tell the people

17     who, I'm assuming the coaches to get out of

18     her room.  But you testified that you

19     weren't there.  At any of these times, how

20     do you know that she said this?

21         A.    The coaches would come tell me

22     if they weren't allowed in her room.

23     Coaches are peers, so they're not allowed

24     to rat on the teacher, they're really

25     colleagues.  So, they're not allowed to do

1                          KOSKI

2    that.  They could tell me that they can't

3    stay there, but they're not supervisors.

4         Q.    You also testified that, I

5    believe, it was in the 2007-2008 school

6    year Ms. Jean-Baptiste wasn't well prepared

7    to teach each day.  Can you tell me what

8    you mean by that statement?

9         A.    Her lesson plans were not

10   current or up to date and she didn't have a

11   folder ready if she was absent for the

12   substitute.  And she basically didn't have

13   her lesson plans up to date.

14        Q.    You also testified that at one

15   point she missed a parent-teacher

16   conference; do you recall when that was?

17        A.    It was one of the first year

18   that she was in the school.  And we called

19   her because she didn't appear at 6:00 for

20   parent-teacher conference.  And her mother

21   answered the phone and she said she had

22   been sleeping and she didn't come for the

23   conference.  She was then obligated to make

24   up the conferences with the parents during

25   her prep periods during the school day, and

**Exhibit E**

P.S. 26 Queens
195-02 69th Avenue
Fresh Meadows, New York 11365
(718) 464-4505

**Dr. Dina Koski, Principal**                    **Mrs. Debra Gershman, Assistant Principal**

October 21, 2003

Dear Parents:

As you know, Mrs. Pavano is going to begin her maternity leave.  Her last day
with class 1-203 will be Friday, October 31, 2003.  Fortunately, the other five
first grade classes have low registers and we will be able to place the children
with other experienced members of the P.S. 26 staff.  This change will take
placed on Monday, November 3, 2003.

In order to make this a smooth transition, Mrs. Pavano will meet with parents on
Wednesday, October 29th.  She will discuss your child's progress.  Report cards
will be completed by her and will be distributed in November.

Thank you for your cooperation.  If you have any questions please call me.

Sincerely,

Dr. Dina Koski
Principal

_____

Child's Name: _____

Appointment time for conference: _____

New Class: _____

____  I can attend the conference.

____  I cannot attend the conference

Parent's Signature: _____

**Exhibit F**

## P.S. 26Q
## The Rufus King School
195-02 69th Avenue • Fresh Meadows, NY 11365
Tel: 718-464-4505 • Fax: 718-464-4644

Dr. Dina Koski, *Principal*

November 14, 2003

Dear Parents,

As you know, Ms. Coccaro is going to begin her maternity leave.  Her last day with class 2-202 will be Friday, November 21, 2003.  Ms. Jean-Baptiste will be the teacher of class 2-202 beginning November 24, 2003.

In order to provide a smooth transition, Ms. Jean-Baptiste has worked closely with Ms. Coccaro.

I am pleased to announce that Ms. Jean Baptiste will meet with the parents of class 2-202 on Thursday, December 4th at 2:40 p.m. in room 202.

If you have any questions, please call me.

Sincerely,

Dr. Dina Koski
Principal

I can attend the meeting on Thursday, December 4th _____

I cannot attend the meeting on Thursday, December 4th _____

Parent's signature_____

YJB 00271

**Exhibit G**

P.S. 26 Queens
The Rufus King School
195-02 69th Avenue
*Fresh Meadows, New York 11365*
*(718) 464-4505*

| Dr. Dina Koski, Principal | Mrs. Debra Gershman, Assistant Principal |
|---|---|

### COUNSELING MEMORANDUM

October 22, 2004

Y. Jean-Baptiste
198-20 Epsom Course
Holliswood, New York

Dear Ms. Jean-Baptiste,

On October 22, 2004, Mrs. Gershman and I met with you to discuss parent complaints. We discussed the allegation that you told a child that she had failed E-CLAS. You admitted saying that. Mrs. Gershman explained that E-CLAS is an assessment tool and a student cannot fail an assessment tool. I also questioned the homework that you assigned for the week of 9/27/04. Furthermore, I told you that when I looked at children's assignments, they were all the same.

I asked you to refer to the September conference notes (attached please find a copy of that information) for the school homework policy. You told us that the children know what to do and specifically, "the newspaper assignment was not based on classwork but a critical thinking activity."

I emphasized that you must follow school policy. Re: homework. Note: Homework must be a <u>follow-up</u> to your lesson and must be differentiated.

If you have any questions, please see me or Mrs. Gershman.

Very truly yours,

Dr. Dina Koski
Principal

DK/mg
Counseling memo

OEO0015

New York City Public Schools  - Community District 26
**Public School 26 Queens**
The Rufus King School
195-02 69th Avenue
Fresh Meadows, NY 11365
(718) 464-4505

Dr. Dina Koski, Principal          Debra Gershman, Assistant Principal

SEPTEMBER FACULTY CONFERENCE
September 7, 2004

I.    Greetings

   1.1   Welcome

   1.2   School/Region Organization

      A.  Please refer to the enclosed tentative organization sheet.

      B.  Lunch Schedule – Grades K, 2 and 5  – Period 4
                          Grades 1, 3, and 4 – Period 5
                          Special Education – Period 6

      C.  Region 3 organization

II.   Agenda for September 2004

   Tues. 9/7 – Faculty Conference 10:00 a.m. in the cafeteria.

   September 8 – 1:15  Meeting in cafeteria, 2:15  Work in classrooms

   September 8      8:30 a.m. Staff Development – cafeteria
   September 9      8:30 a.m. Staff Development – cafeteria
   September 10     8:30 a.m. Staff Development – cafeteria
   Detailed schedule and agenda will follow.

III.  Goals for 2004-2005

   3.1   Region Goals
   3.2   Standards
   3.3   Role of the Leadership Team
   3.4   Comprehensive Education Plan – School Vision/Mission Goals
   3.5   Budget

IV.   Administrative/Supervisory Items

   4.1   Homework procedures
         Homework must be assigned daily and checked.
      A.  **Student homework papers must be given a grade.** (Use rubrics)
          Please check these papers very carefully and emphasize the
          importance of handing in neat and accurate
          homework papers.  Keep accurate records of assignments that
          are not done.
      B.  Please prepare homework and assignments according to
          the needs, interests and abilities of your pupils
          (**differentiate assignments**).  Examples:  Homework that
          involves writing, research, drill practice, study, trips,
          interviews, creative assignments, Pen Pal Program, etc.)
          Homework must be an extension of the day's lesson.
      C.  Please bear in mind that it is not the teacher alone who
          examines homework.  Establish your criteria early and
          maintain standards.  Develop a rubric for homework.
          Post this rubric clearly in your room. Share this
          rubric with parents at orientation.  Homework assignments
          must be given five nights a week.  Homework is never to be
          done in school.
      D.  Reading must be assigned every day.  Encourage recreational
          family reading.  Remember the 30 book campaign.
      E.  Parents will receive a homework policy letter from me.
      F.  Home-School Notebook required for every student.  Discuss at
          parent orientation. Notebooks must be written in regularly.
          Comments should reflect student performance.  Use the report
          card jargon. Use this as a tool for communication about
          academics.  Cluster teachers, resource room and reading
          teachers should also use this tool for communication with
          parents.

OEO0016

**Exhibit H**

**P.S. 26 Queens**
*195-02 69th Avenue*
*Fresh Meadows, New York 11365*
*(718) 464-4505*
*fax 718-464-4644*

_____
Dr. Dina Koski, Principal                    Mrs. Debra Gershman, Assistant Principal
_____

November 3, 2004

Ms. Yvrose Jean-Baptiste
Teacher Class 203

Dear Ms. Jean-Baptiste:

On Monday, November 1, 2004, Dr. Koski and I met with you and Mrs. Goodman to discuss my informal afternoon visit to your classroom on Thursday, October 29, 2004.

When I visited your classroom, you were reviewing the homework assignments with your class. One of the assignments was, "Use best and jump to write other words." A child in your class asked if you wanted them to write words that rhyme with best and jump. You replied that the students were to write rhyming words for homework since you had taught rhyming words earlier in the day.

At our conference, on Monday, November 1, 2004 we discussed our P.S. 26 homework policy and we reiterated the information that was covered in the Counseling Memo dated October 22, 2004. Dr. Koski and I reminded you that homework assignments must be differentiated, specific and clear. I suggested that the homework assignment could have been, "Write five rhyming words with best and jump" or "Use best and jump to write other words. For example: best-test, jump-bump."

In conclusion, I expect that you will differentiate homework assignments, write clear and specific directions and give examples when necessary. — *See response to letter.*

Sincerely,

*Mrs. D. Gershman*

Mrs. Debra Gershman
Assistant Principal

_____

I have received the above letter and understand that a copy will be placed in my file.

*Signed* **Under Protest** + Step 1 Grievance and EEOC
Yvrose Jean-Baptiste                  Complaint to follow. Grievant:

yjb                          Grievant: *Yvrose Jean-Baptiste* 11/15/04

*See response to letter.*

**YJB 00223**

**Exhibit I**

Certified Mail Receipt # 7004 1010 0547 1435

Date:   October 30, 2004

To:     Mr. Daniel Feldman – U.F.T. Representative – D.O. 26

From:   Ms. Yvrose Jean-Baptiste – 2nd Grade Teacher

Re:     Report of Incidents That Have Occurred at P.S. 26Q by Dr. Koski,
        Principal, and Mrs. Gershman, Assistant Principal

Please take note of the acts of incidents that have occurred at P.S. 26Q by
Dr. Koski, Principal , and Mrs. Gershman, Assistant Principal.

I was sent there on a UFT Integration Transfer.

Thanking you in advance for your anticipated cooperation.

Because this situation is urgent, it requires your prompt response.

cc: Public Employees Relation Board
    National Labor Relations Board
    The Liason Equal Opportunity Complaint

## ON-GOING EVENTS THAT HAVE OCCURRED AT P.S.26Q WITH DR. KOSKI – PRINCIPAL, AND MRS. GERSHMAN – ASSISTANT PRINCIPAL

**#1**

On Wednesday, June 11, 2003, around 4:00p.m., Dr. Koski, Principal of P.S. 26Q, **called me at my home and stated that I had been granted a UFT transfer to her school. This information was given to me by Dr. Koski prior to my having received an official letter from the Department of Education. At this time, Dr. Koski told me that she did not have an Early Childhood teaching position for me. However, instead, she had a 5th grade teaching position for me. In addition, Dr. Koski gave me the telephone number of Mrs. DeLucas and asked me to call her at the Personnel Department at the District Office.** Around 8:32p.m., Dr. Koski called again, I was not home, but she spoke with my mother.

On Wednesday, June 11, 2003, the same day as aforementioned above, I spoke with Mrs. DeLucas in the Personnel Department at the District Office about the problem. Mrs. DeLucas told me that she would call me back. However, she never called me back.

**#2**

**In July 2003, I called Mrs. DeLucas, Personel Director, to remind her of the problem with my transfer, she told me: "It is not too late to decline the transfer. And you can always go back to your old school." Immediately, I called Mrs. Mira Cruz who is in charge of the UFT transfers at the UFT headquarters. I informed Mrs. Cruz about the call I received from Dr.Koski, Principal, on June 11, 2003, and what Mrs. DeLucas, Personnel Director, told me.**

**#3**

On Tuesday, September 2, 2003, I reported to P.S. 26Q under a UFT Integration Transfer and an Early Childhood license. Contrary to my request, and Early Childhood license, Dr. Koski, Principal, gave me a 5th Grade Class. Immediately, I called Mrs. Mira Cruz who is in charge of the UFT transfers at the UFT headquarters. I informed Mrs. Cruz of what had happened with my Early Childhood transfer to P.S. 26Q.

OEO0006

**#3 (cont'd.)**

On Tuesday, September 2, 2003, another transferee at P.S.26Q, received her class assignment under a Common Branch license by Dr. Koski, Principal. However, Dr. Koski did not offer me the opportunity to teach in my area of experience and Early Childhood license.

**#4**

On Monday, September 8, 2003, I began teaching a 5th Grade Class at P.S.26Q, under a UFT Integration Transfer, and a teaching position that I did not request, nor is this 5th Grade assignment within my Early Childhood teaching area.

**#5**

On Wednesday, September 10, 2003, I met with Dr. Koski, Principal, and Mrs. Gershman in Dr. Koski's office to discuss my removal from the 5th grade. She decided to put me in a 1st grade class to work with Mrs. Pavano, who was a first grade teacher and who was pregnant, in order to replace her when she left.

**#6**

On Thursday, September 11, 2003, I met with Dr. Koski for her to introduce Ms. Pavano, teacher, to me in order to let her know that I was going to work with her. **While we were at the meeting, she told Mrs. Pavano: "Do you want a Para to help you?" No one replied. Then the next day, my name was listed on the Organization Sheet in the Paraprofessional column. Although, I took over a 2nd Grade Class on November 24, 2003, my name was still listed as a Paraprofessional. It was not properly recorded until December 19, 2003. (See copies)**

**#7**

On October 31, 2003, around 10:00 a.m., Mrs. Gershman , Assistant Principal, called me in her office to tell me: "Beginning tomorrow October 31, 2003, you have to cover classes for the teachers who are Eclassing.  See Ms. Barbara Levy, the Secretary, in the morning.  She will give you the Substitute Program-Classroom Teacher." (See attached)

But, October 31, 2003, was my last day in the 1st Grade Class because Dr. Koski,  Principal, split the class.  In a letter Dr. Koski sent to the parents, she stated that she sent the children to more experienced teachers.  She did not recognized my experience ,and yet I have more years of experience than some of the teachers.

**#8**

On Wednesday, October 13, 2004, around or about 1:50p.m., Dr. Koski, Principal, called over the phone and asked me to give a child my lesson plan book to bring to her in her office.  I gave it to Ivan Choi to deliver to her.  Dr. Koski called me again and asked me to send two children with their homework notebooks to her.  She sent the children with their homework notebooks back to my classroom.  Subsequently there has been no comments, no questions with reference to this request addressed to me by Dr. Koski.  Around or about 2:40p.m., I sent Ivan Choi and Kristin Collins to ask Dr. Koski for my plan book, she told the children she gave it to Mrs. Gershman, Assistant Principal.  I sent the two children to Mrs. Gershman's office, she told them that she put the planbook in my mailbox.  They went back again to the office, they were told my plan book was not in the mailbox.

After  2:50p.m. dismissal, I asked Mrs. Gershman, Assistant Principal, for my plan book, and she told me to check in the mailbox.  When I  have checked my mailbox, it was not there.  I went to Mrs. Gershman in the auditorium, she told me to wait because she had the leftover children from the 2:50 dismissal.  Around 3:20p.m., Mrs. Gershman came with me to the office to look in the mailbox for my planbook and it was not there.

OEO0008

Mrs. Gershman went back to the auditorium, and I followed her there.  Then Mrs. Roxanne Ugas, a school Aide, who was in the auditorium as well, asked Mrs. Gershman: "Was that the notebook you gave to me," and Mrs. Gershman replied to her: "Yes."  Then Mrs. Ugas told her that my plan book is in the **copy room** under the table.  Then Mrs. Gerhsman and I went  to the **copy room**, she retrieved it and gave me my planbook at 3:30p.m. without any comments.

**#9**

On Friday, October 15, 2004 around 10:15 a.m.., Dr. Koski, Principal, came to my classroom unannounced and interrupted my children as they were involved in silent and independent reading activity.  She sat in a chair and asked them to see their homework notebooks.  She questioned the children and asked whether or not I  gave them a homework sheet for the week.  Dr. Koski stopped them from reading and had them go to the homework crate to get  their notebooks to her to inspect.  Dr. Koski also interrupted me during the time when I was using the ECLASS Assessment with one child.  She asked me if I gave them a homework sheet, and I said no.  After her inspection of my children homework books, she left.

**#10**

On Monday, October 18, 2004, around 9:50a.m., Dr. Koski, Principal, called and asked me to send three children with their notebooks.  I sent them to her office with their homework notebooks.  After inspecting their homework notebooks, she sent them to the classroom.  Subsequently, I received no comments.

**#11**

Docking for 2 1/2 hours on Monday, October 18, 2004.  (See copies of letters)

Log26                                    -4-
**#12**

**#12**

On Tuesday, October 19, 2004, Dr. Koski called me in the morning, and asked me to send three children with their notebooks. I sent them to her office with their notebooks. After inspecting their homework notebooks, she sent them back to the classroom. Subsequently, I received no comments.

**#13**

On Wednesday, October 20, 2004, around 9:50 a.m., Dr. Koski came into the classroom and looked at my plan book, stayed for 15 minutes and left.

**#14**

On Friday, October 22, 2004, around 1:25p.m., Dr. Koski's secretary, Barbara Levy, called me and told me that Mrs. Marziliano, the Parent Coordinator **who is not a licensed personnel**, will come to cover my class so I could go to Dr. Koski's office for a meeting. Mrs. Marziliano came to cover the class, and I went to Dr. Koski's office. When I arrived in the office, I met Dr.Koski and Mrs. Gershman. I was wondering why Dr. Koski failed to inform Mrs. Goodman, my Chapter Chairperson about this meeting with me. Dr. Koski proceeded to hold the meeting without my Chapter Chairperson being present. Dr. Koski told me to have a seat, I sat down and she began speaking about an incident that occurred on October 15, 2004 when I was using the ECLASS Assessment with Kristin Collins. I explained to Dr. Koski while I was assessing Kristin Collins I sensed that she was not at ease taking the test, she did not reach the benchmark and I felt she could do better. I told her that she failed the test, but I was certain that she could perform better. So I gave the Reading Fluency part to her again and she reached the **benchmark** as I envisioned she would. On Wednesday, October 20, 2004, I received a letter from Kristin Collin's mother regarding this incident. She requested me to call her at work or at home. I called her at work around 11:30 a.m., and I left a message for her on the voicemail. Then around 4:45p.m. I called her again at work and I spoke with her regarding the incident and she understood. Then I asked her if she wanted to come and speak with me before the Parent Teacher Conference, she told me she can wait for the Parent Teacher conference.
Log26

OFO0010

During the time that I was meeting with Dr. Koski, Principal, and Mrs. Gershman, Assistant Principal, she told me that I hurt Kristin's emotionally and she is going to give me a counselor to work with me.  However, she said: "It is not going to be in your file."  I asked her for what.  She did not reply.

Mrs Gershman,  Assistant Principal, started to question me about my homework style.  She said that parents have been questioning her about the homework I have been giving to the children.  I asked Mrs. Gershman to give me a list of the parents.  She could not provide it.  Mrs. Gershman asked my why did I give the children that particular homework,  **Why do people read newspapers?**,  and I explained to her why I gave the children the homework.  Dr. Koski and Mr. Gershman were just criticizing the homework I gave to my children..

After the meeting was over, I called my Chapter Chairperson and asked her to reschedule the meeting with Dr. Koski and Mrs. Gershman since she was not present.

#### #15

On Monday, October 25, 2004, around 1:40p.m., Dr. Koski called me  and asked me to send three children with their notebooks.  I told her that they were in room 305.  In a few minutes, three children came down to my room and got their homework notebooks and brought them to her for inspection.

#### #16

On Monday, October 25, 2004, I received a memo from Dr. Koski, Principal, in reference to Counseling Memorandum.

To that end, I am faxing a copy of this memo to you.

Log26                                    -6-

OEO0011

**Exhibit J**

**P.S. 26 Queens**
*195-02 69th Avenue*
*Fresh Meadows, New York 11365*
*(718) 464-4505*
*fax 718-464-4644*

---

**Dr. Dina Koski, Principal**                         **Mrs. Debra Gershman, Assistant Principal**

November 15, 2004

Ms. Yvrose Jean-Baptiste
Teacher 2-227

Dear Ms. Jean-Baptiste:

I visited you and your second grade class on November 8, 2004. When I entered the classroom at 8:45 a.m., the daily schedule was posted and the following <u>Do Now</u> was on the board.

|           |            |
|-----------|------------|
| 14-10     | 24-10      |
| - 10 =5   | 26- =16    |

The children were putting away their clothing. At 8:50 you reviewed the <u>Do Now</u> with the students. Following the review of the <u>Do Now</u> you reviewed the homework and had the children give themselves checks. At 9:00 a.m., you instructed the children to "get ready to go to the meeting area". You called the tables to the meeting area. Then you introduced the new student in your class. Next you read alour _____ As you read aloud, you periodically stopped and asked the children to turn and talk. Following each opportunity to turn and talk, you asked the children to share.

The class was then instructed to do a little exercise including jumping jacks.   At 9:20 you wrote the focus for the reader's workshop on the board in the meeting area – "Focus – What is a Character?"

YJB 00217

Page 2
Observation – Yvrose Jean-Baptiste

We met on November 9, 2004 to discuss this observation.  We discussed the
following:

- Daily plan was posted.
- Lesson plan for November 8 was available.  However, prior
  plans were not available.  I explained that lesson plans must be
  available so that there is an understanding of what preceded
  your current lesson.  I will review your lesson plans on Monday.
- During the math workshop on Election Day, the presenter
  discussed the Math Message.  She stated that it should replace
  the Do Now.  I expect that the Math Message will be posted
  daily.  Mrs. Sposato, the math coach, will assist you with the
  implementation of the Everyday Math Program.
- We discussed the fact that homework must be graded using a
  rubric.  I also reminded you that homework must be
  differentiated.  The homework policy is clearly stated in the
  September 2004 conference notes.
- In the future, I expect to see that the reading or writing
  workshop has started by 8:45 a.m.

In conclusion, this was an unsatisfactory lesson.

Very truly yours,

Dr. Dina Koski
Principal

I have read the above and understand that a copy will be place in my file.

Yvrose Jean-Baptiste

Jean-baptiste observ

*Signed Under Protest & Step I
Grievance and EEOC Complaint to
follow
Grievant: Yvrose Jean-Baptiste
11/18/04*

YJB 00218

**Exhibit K**

**P.S. 26 Queens**
*195-02 69th Avenue*
*Fresh Meadows, New York 11365*
*(718) 464-4505*
*fax 718-464-4644*

**Dr. Dina Koski, Principal** _____ **Mrs. Debra Gershman, Assistant Principal**

Ms. Yvrose Jean-Baptiste
Teacher, Class 203

Dear Ms. Jean-Baptiste:

Parent-Teacher Conferences were scheduled for November 16, 2004 from 6-8:30 p.m.
All staff are mandated to meet with parents during these conferences. At 6:00 p.m. you
were not in your classroom. Parents were waiting for their scheduled appointments.
You arrived at school at 6:45 p.m.

I expect that you will arrive at school on time for the Spring conferences which are
scheduled for March 15, 2005 (12:50-2:50 and 6-8:30 p.m.). Failure to comply with this
mandate, may lead to disciplinary action.

Very truly yours,

Dr. Dina Koski
Principal

DK/b

I have received a copy of the above letter and understand that a copy will be placed in
my file.

_____
Yvrose Jean-Baptiste

YJB 00175

**Exhibit L**

**Mrs. Rosanna**

December 6, 2004

Dr. D. Koski
Principle
P.S. 26Q
195-02 69th Avenue
Fresh Meadows, NY 11365

Dear Dr. Koski,

     As a follow-up to our most recent (of many) meeting regarding my son second grade teacher, Ms. Jean-Baptiste, we had addressed many issues which I would like to outline to you.

     Some of the parents of the second grade class of Ms. Jean-Baptiste (2-227) had begun discussions with you during open school week in early October regarding her homework assignments and presentation of such. We have given you copies and expressed our concern that what was being assigned was not being taught or presented in class, our feeling was that we were home schooling our children. At the second grade level we also felt giving out a hand written, illegible weekly assignment sheet was not appropriate. From what I understand, this was addressed by you and Mrs. Gershman and things did change, unfortunately not for the better. For the weeks that followed, the daily homework was a general, "write down what you learned in school today". She was yet again addressed dealing with the daily homework, which then began coming home on small strips of paper and still did not reflect the material being taught in class.

     Being patient and giving things some time, as parents we expressed to you we were not happy. Our main concern was for our children's well being and the issues with Mrs. Jean-Baptiste were not our concern. Our concern is that we get Ms. Jean-Baptiste help and supervision so that we do not waste more second grade learning time than we already have (1/3 of their second grade year has passed). Looking ahead to parent-teachers conferences, report cards and parent sit in, I was eager to experience a day in Ms. Jean-Baptiste's class. Upon arriving at 8:30 A.M., I must say there was not a warm welcome. Further to that, she appeared to be extremely disturbed and distracted when Mrs. Gershman stepped into the classroom to observe, going as far as stopping her read

YJB 00138

Mrs. Gershman , "It's all about the the children", so make it about the children and their right to their second grade education and not about the bureaucracy of The Board of Education.

Sincerely,


P...


CC:    Mr. Walter O'Brien
       Local Instructional Superintendent
       NYC Department of Education – Region 3
       30-48 Linden Place
       Flushing, NY 11354

CC:    Ms. Judith Chin
       Regional Superintendent
       NYC Department of Education – Region 3
       30-48 Linden Place
       Flushing, NY 11354

**Exhibit M**

**P.S. 26 Queens**
The Rufus King School
195-02 69th Avenue
*Fresh Meadows, New York 11365*
*(718) 464-4505*

---

**Dr. Dina Koski, Principal**                    **Mrs. Debra Gershman, Assistant Principal**

---

December 10, 2004


Ms. Jean-Baptiste
Teacher, Class 203

Dear Ms. Jean-Baptiste,

On December 8, Mrs. Goodman, Mrs. Gershman and I met with you to discuss article 8J of the UFT contract and our plans to assist you.

At the conference, I stated that you are in danger of receiving a "U" rating. I stated that we are using Article 8J as a definer of our evaluative techniques. I also informed you that I will collect and review your planbook with you every Wednesday. The planbook must include teaching points for all lessons. Standards based lessons are required. The children must understand what they are doing and why. Homework must be a follow-up to your lesson. The assignments must be explained to the children. Furthermore, differentiation of assignments is required. I referred you to the September, 2004 conference notes for the requirements for homework, planning and student folders for reading, writing and classwork. We agreed that the students may use a notebook in lieu of a reading folder.

Furthermore, we discussed monitoring tools and record keeping. Monitoring tools for each student must include ECLAS II results, running records, conference notes and grades. Monitoring tools are required for math as well as literacy (reading and writing).

Correspondence with parents is important. The home-school notebook is a vehicle for communication. Parents' concerns must be addressed in a timely fashion.

As a means of supporting your growth as a pedagogue, Mrs. Behrman, the literacy coach and Mrs. Sposato, the math coach will model and assist you with the implementation of balanced literacy and Everyday Math. Mrs. Behrman will work with you period 2 on Monday, Tuesday and Thursday. She will plan with you during period 3 on Thursday.

**YJB 00174**

In conclusion, if you have any questions please feel free to discuss them with me or Mrs. Gershman.

Sincerely,

Dr. Dina Koski
DK/mg

Cc:    Walter O'Brien

I have received a copy of the above letter and understand that a copy will be placed in my file.

_____

Yvrose Jean-Baptiste

YJB 00176

**Exhibit N**

# ARTICLE EIGHT
# EDUCATION REFORM

## A. School-Based Management/Shared Decision-Making (SBM / SDM)

The Union and the Board agree that SBM / SDM is a process in which all members of the school community collaborate in identifying issues, defining goals, formulating policy and implementing programs. The uniqueness of each school community requires that the SBM / SDM process and the organizational and instructional issues discussed are determined by the staff, parents, administration and students (where appropriate) at individual schools through the SBM / SDM team. The Union and the Board agree that in order to achieve SBM / SDM at the school level significant restructuring of instruction must occur, and the parties agree to work cooperatively in an effort to bring about these changes.

### 1. Eligibility and Involvement

a. All schools are eligible to apply for participation in SBM / SDM. School participation shall be voluntary and subject to approval by fifty-five (55) percent of the voting, non-supervisory school based staff (e.g., teachers, paraprofessionals, support staff and others) and agreement of the principal, the appropriate superintendent and parents. Similarly, schools involved in SBM / SDM may choose to opt out of the program at any time. The decision to opt out shall be voluntary and subject to approval by at least fifty-five (55) percent of the voting, non-supervisory school based staff.

b. All votes of non-supervisory school based staff concerning participating in SBM / SDM shall be conducted by the UFT chapter.

c. Schools involved in SBM / SDM shall conduct ongoing self-evaluation and modify the program as needed.

### 2. SBM / SDM Teams

a. Based upon a peer selection process, participating schools shall establish an SBM / SDM team. For schools that come into the program after September 1993, the composition will be determined at the local level. Any schools with a team in place as of September 1993 will have an opportunity each October to revisit the composition of its team.

b. The UFT chapter leader shall be a member of the SBM / SDM team.

c. Each SBM / SDM team shall determine the range of issues it will address and the decision-making process it will use.

### 3. Staff Development

The Board shall be responsible for making available appropriate staff development, technical assistance and support requested by schools involved in SBM / SDM, as well as schools expressing an interest in future involvement in the program. The content and design of centrally offered staff development and technical assistance programs shall be developed in consultation with the Union.

### 4. Waivers

a. Requests for waivers of existing provisions of this Agreement or Board regulations must be approved in accordance with the procedure set forth in Article Eight B (School Based Options) of this Agreement i.e. approval of fifty-five (55) percent of those UFT chapter members voting and agreement of the school principal, UFT district representative, appropriate superintendent, the President of the Union and the Chancellor.

b. Waivers or modifications of existing provisions of this Agreement or Board regulations applied for by schools participating in SBM / SDM are not limited to those areas set forth in Article Eight B (School-Based Options) of this Agreement.

c. Existing provisions of this Agreement and Board regulations not specifically modified or waived, as provided above, shall continue in full force and effect in all SBM / SDM schools.

d. In schools that vote to opt out of SBM / SDM, continuation of waivers shall be determined jointly by the President of the Union and the Chancellor.

e. All School-Based Option votes covered by this Agreement, including those in Circular 6R, shall require an affirmative vote of fifty-five percent (55%) of those voting.

**B.  School-Based Options**

The Union chapter in a school and the principal may agree to modify the existing provisions of this Agreement or Board regulations concerning class size, rotation of assignments/classes, teacher schedules and/or rotation of paid coverages for the entire school year.  By the May preceding the year in which the proposal will be in effect, the proposal will be submitted for ratification in the school in accordance with Union procedures which will require approval of fifty-five (55) percent of those voting. Resources available to the school shall be maintained at the same level which would be required if the proposal were not in effect.  The Union District Representative, the President of the Union, the appropriate Superintendent and the Chancellor must approve the proposal and should be kept informed as the proposal is developed.  The proposal will be in effect for one school year.

Should problems arise in the implementation of the proposal and no resolution is achieved at the school level, the District Representative and the Superintendent will attempt to resolve the problem.  If they are unable to do so, it will be resolved by the Chancellor and the Union President. Issues arising under this provision are not subject to the grievance and arbitration procedures of the Agreement.

**C.  School Allocations**

Before the end of June and by the opening of school in September, to involve faculties and foster openness about the use of resources, the principal shall meet with the chapter leader and UFT chapter committee to discuss, explain and seek input on the use of the school allocations.  As soon as they are available, copies of the school allocations will be provided to the chapter leader and UFT chapter committee.

Any budgetary modifications regarding the use of the school allocations shall be discussed by the principal and chapter committee.

**D.  Students' Grades**

The teacher's judgment in grading students is to be respected; therefore if the principal changes a student's grade in any subject for a grading period, the principal shall notify the teacher of the reason for the change in writing.

**E.  Lesson Plan Format**

The development of lesson plans by and for the use of the teacher is a professional responsibility vital to effective teaching.  The organization, format, notation and other physical aspects of the lesson plan are appropriately within the discretion of each teacher. A principal or supervisor may suggest, but not require, a particular format or organization, except as part of a program to improve deficiencies of teachers who receive U-ratings or formal warnings.

## F.  Joint Efforts

The Board of Education and the Union recognize that a sound educational program requires not only the efficient use of existing resources but also constant experimentation with new methods and organization.  The Union agrees that experimentation presupposes flexibility in assigning and programming pedagogical and other professional personnel.  Hence, the Union will facilitate its members' voluntary participation in new ventures that may depart from usual procedures.  The Board agrees that educational experimentation will be consistent with the standards of working conditions prescribed in this Agreement.

The Board and the Union will continue to participate in joint efforts to promote staff integration.

The parties will meet with a view toward drafting their collective bargaining agreements to reflect and embody provisions appropriate to the new and/or nontraditional school program organizational structures that have developed in the last several years, including as a result of this Agreement.

## G.  Professional Support for New Teachers

The Union and the Board agree that all teachers new to the New York City Public Schools are entitled to collegial support as soon as they commence service.  The New Teacher Staff Development Program and Mentor Teacher-Intern Program provide this support, enabling new teachers to expand their range of instructional skills and strategies, and to become actively involved in the life of their school.

### 1. New Teacher Staff Development Program

a. For uncertified teachers without prior teaching experience there will be ten (10) mandatory days of staff development.  Five (5) of these days will take place in the summer prior to the new teacher's employment and the remaining five (5) will take place during the teacher's first year of service.

b. For certified teachers without prior teaching experience there will be five (5) mandatory days of staff development.  Three (3) of these days will take place in the summer prior to the new teacher's employment and the remaining two (2) will take place during the first year of teaching.

c. For teachers who have three (3) or more years of approved outside teaching experience there will be three (3) mandatory days of staff development in the summer prior to the new teacher's employment.

d. Uncertified teachers without prior teaching experience hired after the beginning of the school year will be provided with three (3) days of mandatory staff development before they begin their actual teaching assignment and will be required to complete one (1) day for each remaining two (2) months of the school year.

e. Certified teachers without prior teaching experience hired after the beginning of the school year will be provided with three (3) days of mandatory staff development before they begin their actual teaching assignment and will be required to complete one (1) day for each remaining two (2) months of the school year up to a maximum of two (2) days.

f. Teachers who have three (3) or more years of approved outside teaching experience hired after the beginning of the school year will be provided with three (3) days of mandatory staff development before they begin their actual teaching assignment.

g. The content and design of this professional development program for new teachers shall be developed collaboratively by the Union and the Board and will take into account varying needs of new teachers based upon their educational and professional

Case 1:07-cv-03535-FB-CLP   Document 43   Filed 07/20/09   Page 124 of 157 PageID #: 281

backgrounds. As an additional option the Union and the Board agree to develop criteria for college courses that can be credited toward fulfillment of the first year professional development requirement in order to coordinate services and requirements for new teachers.

h. There shall be an expense stipend for each day of mandatory professional development for new teachers paid at the rate per day set forth below:

Current............................................................$33.15
Effective December 1, 2003............................$33.81
Effective December 1, 2004............................$34.47
Effective October 1, 2006...............................$35.59

Provisions for payment of this stipend shall not apply to persons opting for the above mentioned college courses.

**2. Mentor Teacher Intern Program**

a. The Mentor Teacher Intern Program is designed to improve instruction for children in the New York City Public Schools by supporting the development of beginning teachers. At the core of the program is the relationship that develops between the skilled, experienced teacher (mentor) and the uncertified colleague (intern). This relationship provides a forum for the uncertified teacher to identify issues that form the basis of his or her professional development. For the mentor, it provides the opportunity to share years of accumulated skills and experience.

b. In accordance with state law and regulations: time will be provided for mentor-intern interaction; information shared between the mentor and the intern must remain confidential; and the building principal/supervisor does not rate teachers in their role as mentor or intern. Specific details will be jointly agreed upon by the Union and the Board.

c. All mentors are required to teach a minimum of one (1) period daily. Mentors are selected and matched to one (1) or more intern(s) by the Mentor Advisory Selection Committee. Full-time mentors serving in more than one building shall maintain seniority and the right of return to the site in which they previously served.

d. The Mentor Advisory Selection Committee is a 12 member committee with a majority of teachers who are selected by the Union. Its responsibilities include setting policy with regard to the Mentor Teacher-Intern Program, selecting mentors for recommendation to the appropriate superintendent, matching mentor-intern teams, requesting variances and coordinating district staff development for mentors and interns. The committee selects its chairperson through consensus. Operating procedures for the Mentor Advisory Selection Committee shall be jointly determined by the Union and the Board.

e. The assignment of a mentor to an intern shall be made at the commencement of service but no later than the 20th day of service to the maximum extent possible. Exceptions will be made for those whose service commences after agreed upon dates, annually determined by the Union and the Board.

f. All newly hired, uncertified teachers who do not possess the minimum number of education credits and student teaching/required experience necessary for a regular license shall participate in the Mentor Teacher-Intern Program for one (1) year. This program shall be provided by a mentor.

The parties will jointly request on an annual basis a waiver of State Education Commissioner's Regulation 80.18 to offer in satisfaction of the State Mentoring requirement for uncertified teachers a cost effective, substantive, high quality, professional development program as provided in Special Circular No. 14, 1992-93 dated September 30, 1992.

g. A mentor is a skilled, experienced colleague who has chosen to share his or her expertise by assisting the intern. A mentor has five (5) or more years experience and possesses permanent certification in the same or related license area as the intern. Preference in selecting mentors may be given to teachers who have served three (3) of the last five (5) years in their present school. Teachers who have transferred through the UFT Transfer Plan or teachers who have been excessed into the school may use previous school experience to qualify for three (3) years in the current school.

h. The Union and the Board agree to collaboratively develop a professional development program for mentors.

### 3. Professional Support Periods and Assignments

a. Guidelines for the use of professional support periods for new teachers will be established. Under the direction of the principal, their use will include but not be limited to activities supportive of upgrading instruction such as: observation of classes conducted by experienced teachers, consultation with others familiar with such areas as instructional strategies in the classroom, planning, curriculum and behavior management.

b. During the first year of employment of a teacher who has not had previous professional employment as a teacher, two preparation periods per week shall be designated as professional support periods.

c. For uncertified teachers being mentored during their second year of employment, two preparation periods per week shall continue to be designated as professional support periods exclusively for the purpose of mentoring.

d. During the first year of employment, a new teacher will be exempt from the generally applicable policy of rotation of teaching assignments. If the number of new teachers makes it impractical to apply this provision, an alternative to this approach may be implemented if jointly approved by the Board and the Union. Guidelines for this purpose will be issued by the Chancellor after consultation with the Union. New teachers may not volunteer or be assigned to coverages during their professional activity periods.

### H. Professional Development and Second Differential

As one aspect of the parties' interest in professional development, a joint Board-Union committee comprised of three (3) designees of the UFT President and three (3) designees of the Chancellor was established to expand and professionalize available staff development opportunities. As a priority, the joint committee focused on new professional development opportunities for teachers seeking their second differential, and for other pedagogues seeking a comparable differential, and made its initial recommendations to the Chancellor. It is the intention of the parties to make such opportunities available to staff at no or modest cost, and with no additional cost to the employer. The Chancellor may establish limits on the number of these credits which can be earned per term toward the second differential via this professional development initiative (the P-credit program). It is understood that the Chancellor's decisions about all aspects of the Committee's recommendations, the design of the P-credit program and regulations for implementation of the P-credit program shall be final and binding on the

parties and not subject to the grievance process. Any claim concerning the arbitrary, capricious and/or discriminatory application of such regulations to individuals will be grievable and arbitrable.

## I.  Reduction of Paperwork

Committees composed equally of representatives of the Board and the Union shall be established at the central, district and division levels to review and reduce unnecessary paperwork required of employees.

Any proposed additional paperwork shall be reviewed by the appropriate level committee and such committee may make recommendations to the Chancellor, community superintendent or division head as appropriate. The Board shall not act unreasonably on the committee's recommendations.

## J.  Evaluation and Observation System

1. The UFT and the Board of Education are committed to attracting and retaining the most competent staff. To this end the Union and the Board established a joint committee which undertook a study to develop and design a high quality prescriptive evaluation and professional growth system that would give each staff member choices and a role in his/her professional growth.

Following the study, the Union and the Board agreed upon such a system. The parties' full agreement is embodied in the document entitled "Teaching for the 21st Century" and the attachments thereto, which is the definitive document regarding the evaluation/observation plan. Under that plan, performance reviews are based on assessment/evaluation procedures which identify and recognize the range of abilities and experiences of teachers and link a teacher's performance, a school's educational goals and related professional development activities. The reviews must be based on the agreed upon characteristics of good teaching, including consideration of positive student learning outcomes and parent involvement.

2. The plan also provides the following:

a. Where appropriate, the performance review must include clear and specific recommendations for professional growth.

b. Annual performance reviews may be based on either of two models:

The first model, known as Annual Performance Options (Component A), offers an individual teacher, in consultation with his/her supervisor, the opportunity to set yearly goals and objectives and to choose the methods for demonstrating professional growth. The annual performance options will be supported with appropriate follow-up professional development activities, as noted below.

The second model, known as Formal Observations (Component B), is the traditional classroom observation by a principal or supervisor which includes pre- and post-observation conferences and written feedback/comments.

c. In an individual decision between the teacher and the supervisor, satisfactory, tenured teachers may choose either Component A or B or both as the basis for the annual performance review. A process has been agreed upon to facilitate agreement in instances where a teacher and a supervisor have differences in professional judgment concerning the annual performance review option.

d. New and probationary teachers who are new to a school, tenured teachers in danger of receiving an unsatisfactory rating, and tenured teachers who received an unsatisfactory rating the prior year must use Component B as the basis of their annual performance

review, although, with the principal's concurrence, Component A may be utilized as a part of their performance review.

e. Each component, or combination, should be implemented in a way that promotes the agreed upon characteristics of good teaching.

f. The principal has final responsibility for rating a teacher's performance.

g. The Board must inform parents of the agreed upon characteristics of good teaching and the principal must inform parents of the school's procedures for evaluation of teachers.

h. Impleme ntation of the plan has two phases. Phase I introduced and defined the new performance review model to all teachers, supervisors, superintendents, parents and other members of the school community.   Phase II's focus is on specific professional development activities and opportunities for individual teachers as they identify specific goals and objectives and/or areas for improvement.   Any activities that require new and/or additional resources will be dependent on the Board and the Union jointly identifying, seeking and obtaining specific revenue sources.

i. The President of the Union and the Chancellor may agree to make adjustments to the plan as necessary, but in any event the parties commit to a formal review of all aspects of this article.

3. T he provisions set forth in this Section I shall be subject to the grievance procedure and to arbitration only for the purpose of determining whether there has been a failure to comply with the procedural requirements contained in the plan.   In the event that a teacher appeals a rating, the appropriate forum for claiming a failure to comply with procedures is the rating appeal process and not the grievance/arbitration procedure.

**K.  Referral of Students for Evaluations**

Educators shall exercise proper discretion prior to referring students for evaluations, either for the provision of or decertification of special education services.  To that end, the Board will maintain a work environment free from reprisals based upon the proper and professional exercise of responsibilities related to the identification of students who have or are suspected of having disabilities.

**L.  Labor/Management Committee On Long Term Reforms**

With regard to the long term recommendations the 2005 Fact Finders made subject to adequate CFE funding, the parties shall establish a Labor Management Committee to discuss the following issues: a) bonuses, including housing bonuses, for shortage license areas; b) a pilot project for school-wide based performance bonuses for sustained growth in student achievement; c) salary differentials at the MA-5 through MA-7 levels; and d) a program for the reduction of class size in all grades and divisions.  If the parties agree on the terms of any or all of these issues, they may be implemented by the Board using whatever funds may be identified.

**Exhibit O**

**NEW YORK CITY BOARD OF EDUCATION**
DIVISION OF PERSONNEL
OFFICE OF APPEALS AND REVIEWS
65 Court Street, Brooklyn, New York 11201
BE/OP 9956B (5/87) para d1   (Replaces OP 11B)

## ANNUAL PROFESSIONAL PERFORMANCE REVIEW AND REPORT ON PROBATIONARY SERVICE OF PEDAGOGICAL EMPLOYEE
(OTHER THAN SUPERVISOR, GUIDANCE COUNSELOR, SCHOOL SOCIAL WORKER, PSYCHOLOGIST, EDUCATIONAL EVALUATOR, SCHOOL SECRETARY)

| LICENSE | | APT. NO | | FILE NUMBER |
|---|---|---|---|---|
| | STATE | ZIP CODE | SOCIAL SECURITY NUMBER | |
| | | | TENURED | PROBATIONER | SUBSTITUTE |

| CURRENT SALARY RATE $ | FOR PROBATIONERS: Date of Appointment | Jinoma Credit | N.Y.S Tenure Credit (Max. 1 year) | Date of Completion of Probation |
|---|---|---|---|---|

| SCHOOL 26 | BOROUGH Q | DISTRICT 26 |
|---|---|---|

| | FIRST YEAR | | | SECOND YEAR | | | THIRD YEAR | | | DAYS IN C.A.R. | OR BOR-ROWED DAYS | SUBSTI-TUTE SERVICE NO. OF DAYS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TIMES NO. | TIME LOST DAYS | HRS. | MIN. | TIMES NO. | TIME LOST DAYS | HRS. | MIN. | TIMES NO. | TIME LOST DAYS | HRS. MIN. | | |
| LATENESS* | | | | | | | | | | | | | |
| ABSENCE* Exclude Non-Attendance | | | | | | | | | | 47 days 1 hr 10 minutes | | | |

* NOTE: For reports on probationers complete 1 to 3 years as applicable. For all other personnel use "First Year" to denote current year.

## SECTION 1 - REPORT BY PRINCIPAL OR OTHER APPROPRIATE SUPERVISOR

| COMMENTS (as checked. "NA" indicates "Not Applicable.") | SATIS-FACTORY | UNSATIS-FACTORY | ADDITIONAL COMMENTS |
|---|---|---|---|
| **A. PERSONAL AND PROFESSIONAL QUALITIES** | | | |
| 1. Attendance and punctuality | | | |
| 2. Personal appearance | | | |
| 3. Voice, speech and use of English | | | |
| 4. Professional attitude and professional growth | | | |
| 5. Resourcefulness and initiative | | | |
| **B. PUPIL GUIDANCE AND INSTRUCTION** | | | |
| 1. Effect on character and personality growth of pupils | | | |
| 2. Control of class | | | |
| 3. Maintenance of wholesome classroom atmosphere | | | |
| 4. Planning and preparation of work | | | |
| 5. Skill in adapting instruction to individual needs and capacities | | | |
| 6. Effective use of appropriate methods and techniques | | | |
| 7. Skill in making class lessons interesting to pupils | | | |
| 8. Extent of pupil participation in the class and school program | | | |
| 9. Evidence of pupil growth in knowledge, skills, appreciations and attitude | | | |
| 10. Attention to pupil health, safety and general welfare | | | |
| **C. CLASSROOM OR SHOP MANAGEMENT** | | | |
| 1. Attention to physical conditions | | | |
| 2. Housekeeping and appearance of room | | | |
| 3. Care of equipment by teacher and children | | | |
| 4. Attention to records and reports | | | |
| 5. Attention to routine matters | | | |
| **D. PARTICIPATION IN SCHOOL AND COMMUNITY ACTIVITIES** | | | |
| 1. Maintenance of good relations with other teachers and with supervisors | | | |
| 2. Effort to establish and maintain good relationships with parents | | | |
| 3. Willingness to accept special assignments in connection with the school program | ✓ | | |
| **E. ADDITIONAL REMARKS** (additional sheets, signed and acknowledged may be attached): | | | |

## SECTION 2 - PERFORMANCE EVALUATION

| OVERALL EVALUATION  S, U, or D (D for first year probation only) For the period: From 9/7/04 to 6/23/05 | S | SIGNATURE OF PRINCIPAL (If other - give title) _6/10/05_ DATE | ACKNOWLEDGMENT BY EMPLOYEE I have received this report on: _6/1/05_ DATE   SIGNATURE OF EMPLOYEE |
|---|---|---|---|

YJB 00103

## SECTION 3. - TO BE COMPLETED ONLY FOR PROBATIONARY PERSONNEL

**A.** RECOMMENDATION BY PRINCIPAL OR OTHER APPROPRIATE SUPERVISOR: To be completed and forwarded to the Community Superintendent or, for City District employees, to the responsible Superintendent.

1. ☐ I recommend approval for continued probationary service

   ☐ I recommend certification of completion of probation

2. ☐ I recommend discontinuance of probationary service

   ☐ I recommend denial of certification of completion of probation

SIGNATURE OF PRINCIPAL (if other, give title)                    DATE

**B.** SUPERINTENDENT'S RECOMMENDATION. To be completed by Community or responsible Superintendent and returned to originating unit for employee's acknowledgement.

I recommend _____

Date _____ Signature of Superintendent _____
                   (if other, give title)

**C.** ACKNOWLEDGEMENT BY PROBATIONARY EMPLOYEE

I have received this report on:

Date:                              Signature of Employee

## SECTION 4. - DOCUMENTATION

All recommendations for discontinuance or denial of certification must be accompanied by copies of substantiating documentation attached hereto, including, but not limited to, observation reports, letters, time cards or time sheets, or other relevant material.

| Item No. | Date | Description or Identification | Key |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

NOTE: If space is insufficient to list all documentation, listing on additional sheets may be attached. If there are such continuation sheets, check here ☐.   Number of additional sheets:

### RULES AND INSTRUCTIONS

1. For "Satisfactory" evaluations, prepare two copies: Copy 1 for the employee, copy 2 for the school file.

2. For adverse evaluations (U or D), prepare four copies for distribution as follows: Copy 1 for employee, copy 2 for school file, copy 3 to the appropriate superintendent and copy 4 to the Bureau of Teacher Records, 65 Court St., Brooklyn, N.Y. 11201.

3. For recommendations for continued service or completion of probation for probationers, prepare three copies of report for distribution as follows: Copy 1 for superintendent, copy 2 for originating school and copy 3 for the employee.

4. For recommendations for discontinuance or denial for probationers, prepare *eight copies* of report and *seven complete sets* of documentation as listed in 'Section 4' of this form for distribution as follows: Copies 1, 2 and 3 (with documentation attached) as listed in Rule 3; Copy 4 (without documentation) to the Bureau of Teacher Records; Copies 5, 6, 7 and 8 (with documentation attached to the Office of Appeals and Reviews, 65 Court Street - Room 717, Brooklyn, N. Y. 11201.

5. Appeals: An appeal from adverse evaluation (U or D) must be made in writing by the employee and forwarded to the Executive Director of the Division of Personnel for the attention of the Director, Office of Appeals and Reviews within three weeks after receipt of such adverse evaluation (exclusive of the summer vacation).

6. All personnel are hereby advised of their right to submit written comments concerning:
   a) each observation report on their performance
   b) evaluation reports

MGO 00116082   25-3200.05.9 (5000 pkgs) 3/89

YJB 00104

**Exhibit P**

# UFT STEP I GRIEVANCE

School: **P.S. 26Q**                    District **26**
Grievant:  **Yvrose Jean-Baptiste**
Title: **Teacher of Early Childhood**
File Number: 666324
Date Grievance Occurred: November 8, 2004---"Informal  Observation" of Class Lesson

Grievance:

Please be informed that the observation of lesson in question occurred between 8:45 a.m.
and 9:25 a.m. This was an "unannounced" observation, which did not include or afford
to me a pre-observation conference. The post-observation conference, as per the
principal's  bulleted comments did not clearly or accurately state the areas we discussed.
The manner in which the principal has stated the discussion misrepresents what was said
and makes it appear that I am not following the September 2004 conference directives.
In pursuit of safeguarding my professional career and integrity, I find it necessary to
grieve this observation.

In accordance with Article 8J of the UFT collective bargaining agreement, outlining
observations and assessment/evaluation procedures, I have not been afforded fair
evaluation practices in assessing my teacher performance. (While this is an ongoing
occurrence that is being cited in my complaint to the Equal Employee Opportunity
Commission, I am addressing this current grievance herein). I am grieving the way in
which I have been evaluated in violation of Article 8E,  8J, and Article 24  resulting in a
"U" rating of this lesson. Furthermore, prior to the principal's unannounced visit, at no
time has the principal set a protocol requiring me to provide a plan book; and I request
the rationale for this procedure. Why am I being treated differently from other teaching
professionals in the building?

Remedy Sought:
   1. Clear and accurate language to describe bulleted items listed in observation report
      referencing principals' version of what was discussed
   2. Rescinding of "U" rating on Lesson of November 8, 2004
   3. Utilization of fair practices in accordance with Articles  8E, 8J , 24 to evaluate
      teaching performance
   4. Superintendent Observation: I was appointed on an Integration Transfer to
      P.S. 26Q and reserve the right to ask that District Office 26 of the Region 3
      Superintendency conduct a classroom observation of my teaching performance
      at P.S. 26Q.


_Yvrose Jean-Baptiste_
                    Signature of Grievant

                    Date filed: November 17, 2004


C: Mrs A. Goodman – UFT Chapter Leader
   Mr. Al Samuels, UFT – Queen District Office

YJB 00156

**Exhibit Q**

## UFT STEP I GRIEVANCE ANDEEOC COMPLAINT

**School:** P.S.26Q_                    **District** 26
**Grievant:** Ms. Yvrose Jean-Baptiste
**Title:** Teacher of 2nd Grade
**File Number:** 666324
**Date Grievances Occurred: Commenced Fall 2003-Present**
**Bullet Specific Dates: 6/11/03, 7/03, 9/2, 9/8, 9/10, 9/11, 10/31/03**
**9/21/04, 10/13, 10/15, 10/18, 10/19, 10/20, 10/22, 10/25, 10/28, 11/1, 11/3, 11/5,**
**11/9, 11/10, 11/15, 11/16/04**

### Grievance Overview for Clarity and Understanding

### Background

Like any professional, I expect to be treated with dignity and respect.   Since transferring to P.S. 26Q in September of 2003 on an Integration Transfer, I have not been afforded these basic rights.  Instead, I have been intimidated, harassed, discriminated against, and belittled as a professional.

I have been with the New York City Public School System for 14 ½ years.  In that time, I have always enjoyed a good working relationship with administrators, colleagues, students, and parents.  I have diligently worked to implement the instructional goals and objectives of the school and have been commended for the effectiveness of my teaching style.

Since transferring to P.S. 26Q, the principal and assistant principal have never discussed my teaching credentials, background or letters of commendation to foster a comprehensive learning environment and conciliatory working relationship with me. They were never welcoming or inclusive of my being a member of the faulty.  Whereas many schools would have been delighted to welcome a teacher with my background, this administration chose to call my home to abort my transfer, literally insulted me in front of the school community by classifying me as a paraprofessional, bounced me around when there was a teaching position in my area of Early Childhood. (As I learned in hindsight, the principal did not want to bump a Caucasian teacher with less seniority than me.  The Department of Education under the UFT Integration Transfer assigned me to District 26 at  P.S. 26Q in the area of Early Childhood—the principal's practice was questionable, if not illegal).

I am dedicated to the children entrusted to my care but find myself being treated like a child in a hostile teaching environment.  I am a teacher of Haitian-American descent, one (1) of 4 teachers  of color that comprises the entire teaching staff of 44.

This grievance is long overdue as I continue to be belittled in front of my students and parents and as my collective bargaining rights are violated.  My professional life and career are at stake.  Tactics are being used to stain my teaching record and to rate me as an unsatisfactory teacher.  Moreover, I was not apprised of my rights last year by the union representative and have had to seek advice from the union office for this year's ongoing incidents.   I am seeking resolve and am looking to the Union and the Equal Employees Opportunity Commission to investigate this grievance and complaint.

### Grievance and Articles

YJB 00179

I am grieving the observation reports, letters, constant unannounced visits and calls to my class room. They are secondary to my primary issue of harassment and discriminatory treatment. Further elaboration follows. In pursuit to the initial harassment, the principal had called my home twice on the same day to abort my transfer. New York State's general statute prohibits phone calls with the intent to harass, annoy, or to call repeatedly.

In accordance with Article 8J of the UFT collective bargaining agreement, outlining observations and assessment/evaluation procedures, I have not been afforded fair evaluation practices in assessing my teacher performance. I am grieving the way in which I have been evaluated in violation of Article 8E, 8J, and Article 24A. (On November 15, the principal rated my lesson of November 8 unsatisfactory. A grievance has been filed separately to address the issue).

In pursuant to Title VII, I believe I have been discriminated against based on my race. The UFT Integration Transfer is supposed to be a means by which the school system might be in compliance with federal Executive Order 11246. This law bars discrimination on the basis of race, gender, or national origin and affirms a means to ensure that minorities in the workplace are the same as that in the general population. It is illegal for an employer to adopt a policy or practice that has a "disparate impact" that will screen out a minority. To my knowledge and belief, Principal Koski used tactics to discourage my Integration Transfer and continues such actions to break my morale. In hindsight and in light of this year's humiliating actions targeted at me, I realize that the observation reports, letters, calls and visits to my class room, are harassing tactics to stain my impeccable teaching credentials. These are not isolated but concerted incidents targeted at me to fail and perhaps loose my composure.

It is my belief that the principal and assistant principal have demonstrated a misuse of power and authority as indicated in Article 18C. In accordance with filing Article 2, and the discrimination claim I am submitting to the EEOC, my grievance and claim shall be filed as follows.

EEOC—will receive the claim and grievance in its entirety, attachments included, for edification and clarity into the time and dates of the incidents. This discrimination complaint is tied into contractual issues and cannot be separated.

UFT--The four-page Step I Grievance is being filed with the school.

The Queens Union Office will receive the Step I Grievance with attachments.

### Articles of Grievance:

**Article 2—Discriminatory practices (filed with the EEOC)**
Listing me as a paraprofessional; Shuffling me around rather than assigning me to an Early Childhood class saying that "I don't have that much experience" when I had more experience than the teachers she spoke about; Taunting me in front of parents and students, asking children to see their notebooks and homework while teaching my class carelessly interrupting the lesson by doing so(see log)

**Article 23 --** In pursuit to fair and equitable treatment, I am being intimidated, harassed, and treated differently from other teachers on staff. I seek immediate redress and relief. Calls to my home, belittling me in front of parents and students, dispersions created on Open School Night while I was interacting with parents, refusal to direct parents to follow the line of command thereby fostering tense teacher/parent relations.

**Article 8-E—**I was never given cause to have to present a plan book but circumstances changed on September 21 of this year when I was suddenly asked to do so. On that date everything was fine; however, the nit-picking began the next week. Constant visits were made to my class room to see my plan book and my plan book was also deliberately lost.

YJB 00180

(See log)  The principal is treating me as a "U" rated teacher. These were unfair tactics to cause me to fail and become distracted in my work.

**Article 8-J**  In pursuit to fair and equitable treatment, upon transferring to the school and up until now, I was never given my right to an observation option for teacher assessments.  I am constantly receiving unannounced observations/visits with no pre-observation conferences.

**Article 24-A**

"If the problem is a difference of opinion about an educational matter, the chapter can initiate a 'professional conciliation' process with the school administration. Many chapters have transformed relations at their schools using one of these approaches. The important thing to remember is that you have a right to respect both as a person and as a professional. The union is also seeking to strengthen your right to professional treatment." ("Do Unto Others", NY Teacher 4/8/03)

In support of the above, I am expecting the intervention of the UFT, to proactively remedy the abridgement of my right to professional treatment and "professional conciliation."

**Article 18-C**

Principal's misuse of authority in teacher placement and subsequent events (see log). The principal did not act in good faith to further staff integration.  This is evident in her handling of the situation and as documented in the log.

**Remedy Sought:**

1. Immediate relief from discrimination, intimidation and harassment
2. Immediate meeting with principal, assistant principal
3. Because the principal has not instructed parents to follow the line of command when dealing with an educational issue concerning me, I have been the target of ridicule by these parents. I am seeking an apology and mediation, which is necessary, to help remedy the hostile climate and distrust these parents have harbored against me.
4. Professional Conciliation
5. Investigation into the handling of my Integration Transfer.
6. Investigation into the number of appointments with regard to teachers of color to P.S. 26Q  and the outcomes of those teachers
7. Findings within the past 5 years of the Federal Ethnic Census Report to ascertain whether District 26 has significantly appointed teachers of color to P.S.26Q.


*Yvrose Jean-Baptiste*
**Signature of Grievant**

Date filed: November 19, 2004



C:   **EEOC**
**Chapter Leader**
**Al Samuels, Queens UFT District Office**


**Attachments:**
**Attachment I—Observation Report, Letters and Reply**

YJB 00181

**Exhibit R**

# STEP I GRIEVANCE FORM

SCHOOL: _P.S. 26_   DISTRICT: _26_

NAME OF GRIEVANT: _Yvrose  Jean- Baptiste_

TITLE (TEACHER, GUIDANCE COUNSELOR. ETC.): _teacher_

SOC. SEC. #: _____    FILE #: _666324_

DATE GRIEVANCE OCCURRED: _11 3 04_

SET FORTH SPECIFICALLY THE ACT OR CONDITION AND THE GROUNDS ON WHICH THE GRiEVANCE IS BASED:

_unfair ¦ inaccurate_

___ This is a RE-ORGANIZATION grievance

SPECIFIC CONTRACTUAL ARTICLE(S) AND SECTION(S) ALLEGED TO BE VIOLATED:

_Article  21 A5_

SPECIFIC REMEDY SOUGHT:

_removed  from file_

I SHALL BE REPRESENTED BY _Ms. Goodman_   MY CHAPTER LEADER OR A DESIGNATED ALTERNATE.

_____
Signature of Grievant

DATE FILED: _11 19 04_

_This is a supplement to the
step I UFT Grievance +
complaint dated 11/19/04._

- G3 -

YJB 00155

**Exhibit S**

*Amended to November 8, 2004*

## STEP I GRIEVANCE FORM

SCHOOL: P.S. 26 Q                    DISTRICT 26

NAME OF GRIEVANT: Yvrose Jean-Baptiste

TITLE (TEACHER) GUIDANCE COUNSELOR, ETC.): _____

SOC. SEC.#: _____   FILE # 666324

DATE GRIEVANCE OCCURRED: 11/8/04

**SET FORTH SPECIFICALLY THE ACT OR CONDITION AND THE GROUNDS ON WHICH THE GRIEVANCE IS BASED:**

Then on November 8, 2004, Dr Koski, Principal, intruded on my Classroom activity and made a Judgment about my pedagogy.

There has been harassing material placed in my file as it was not Consistent with Articles: 8J, 21A1,2,3,4,5

**SPECIFIC CONTRACTUAL ARTICLE(S) AND SECTION(S) ALLEGED TO BE VIOLATED:**

21 A1, 2, 3, 4, 5  (Teacher- Files)

" 8J, 2(A)d  (Evaluation Systems and Observation)

**SPECIFIC REMEDY SOUGHT:**

I want to have derogatory material removed from my personnel file.

Evaluation must take place within the confines of Article 8J of the Collective Bargaining Agreement.

**I SHALL BE REPRESENTED BY** U. Goodman **MY CHAPTER LEADER OR A DESIGNATED ALTERNATE.**

Yvrose Jean-Baptiste
_____
**Signature of Grievant**

DATE FILED: 12/6/04

This is a supplement to the Step I UFT Grievance & EEOC complaint dated 11/19/04

YJB 00145

**Exhibit T**

P.S. 26 Queens
195-02 69th Avenue
Fresh Meadows, New York 11365
(718) 464-4505
fax 718-464-4644

**Dr. Dina Koski, Principal**                    **Mrs. Debra Gershman, Assistant Principal**

December 16, 2004

Ms. Yvrose Jean-Bapstiste
Teacher Class 203

Dear Ms. Jean-Baptiste:

You filed an amended grievance on December 6, 2004 claiming that your rights pursuant to Articles 21A1, 2, 3, 4, 5 and 8J of the collective bargaining agreement were violated when I observed you on November 8, 2004 and placed a letter dated November 15, 2004 in your file.  I met with you, Mrs. Gershman, Assistant Principal and Mrs. Goodman, Chapter Leader on December 9 to discuss your grievance.

I deny your grievance because the letter describes what I saw during my observation.

Very truly yours,

Dr. Dina Koski
Principal

DK/bl

Cc: Arlene Goodman

Deny grievance j-b

YJB 00199

**Exhibit U**

## ARTICLE TWENTY-TWO
## GRIEVANCE PROCEDURE

It is the declared objective of the parties to encourage the prompt and informal resolution of employee complaints as they arise and to provide recourse to orderly procedures for the satisfactory adjustment of complaints. A resolution should occur at the earliest possible step in every case that can reasonably be resolved.

In order to accomplish its stated purpose, a grievance conference must be attended by those individuals who may be able to promote resolution or, if resolution is not possible in a particular case, to provide the necessary information for a fair determination of the grievance. At the Chancellor's level, principals will be expected to attend or to have a suitable representative present at the conference. Failure to attend may result in sustaining the grievance on procedural grounds.

### A. Definition

A "grievance" shall mean a complaint by an employee in the bargaining unit (1) that there has been as to him/her a violation, misinterpretation or inequitable application of any of the provisions of this Agreement or (2) that he/she has been treated unfairly or inequitably by reason of any act or condition which is contrary to established policy or practice governing or affecting employees, except that the term "grievance" shall not apply to any matter as to which (1) a method of review is prescribed by law, or by any rule or regulation of the State Commissioner of Education having the force and effect of law, or by any bylaw of the Board of Education or (2) the Board of Education is without authority to act.

In the case of per session employees, a "grievance" shall mean a complaint by a per session employee that there has been as to him/her a violation, misinterpretation or inequitable application of any of the provisions of this Agreement covering his/her particular per session employment.

In the case of teachers assigned, education administrators, education officers, education analysts, adult education teachers covered by this Agreement, lead teachers, math and literacy coaches, mentors, substitute vocational assistants, and teacher's assistants, a "grievance" shall mean a complaint by such an employee that there has been as to him/her a violation, misinterpretation or inequitable application of any of the provisions of this Agreement covering his/her employment as a teacher assigned, an education administrator, an education officer, an education analyst, a WNYE teacher, an adult education teacher covered by this Agreement, a lead teacher, a math and literacy coach, a mentor, a substitute vocational assistant or a teacher's assistant.

As used in this article, the term "employee" shall mean also a group of employees having the same grievance.

### B. Adjustment of Grievances

Grievances of employees within the bargaining unit shall be presented and adjusted in the following manner:

#### 1. General Procedures
#### a. School Level (Step 1)

Any employee within the bargaining unit may, either orally or in writing, present a grievance to the head of the school within thirty school days after the employee has knowledge of the act or condition which is the basis of the complaint. A grievance which is presented in writing shall set forth specifically the act or condition and the grounds on

which the grievance is based, the contractual provision which is alleged to have been violated and the remedy sought. A Step 1 Grievance Form such as the one set forth in Appendix C shall be used, but failure to use the form will not result in forfeiture of the grievance. A grievance which is technically flawed at Step 1 may be promptly amended or refiled without regard to the stated time limitations.

The employee and the head of the school shall confer on the grievance with a view to arriving at a mutually satisfactory resolution of the complaint. At the conference, the employee may appear personally or he/she may be represented by a Union representative or by any teacher of his/her choice in the school; but where the employee is represented he/she must be present. The Union representative shall be the chapter leader or his/her alternate in the school or, where there is no Union member in the school, any other designated Union representative.

Whenever a grievance presented to the head of the school by the employee personally or through a personal representative would involve the application or interpretation of the terms of this Agreement, or would affect the working conditions or welfare of the employees in the bargaining unit, he/she shall give the chapter leader or his/her alternate in the school the opportunity to be present and state the views of the Union, except that, where there is no Union member in the school, the Union may be represented by any other designated Union representative.

The head of the school shall communicate his/her decision to the aggrieved employee and to his/her representative and to any Union representative who participated in this step within five school days after receiving the complaint. Where the grievance has been presented in writing, the decision shall be in writing and the decision shall include supporting reasons in response to the information supplied by the grievant on the Step 1 Grievance Form or its equivalent.

### b. Chancellor (Step 2)

If the grievance is not resolved at Step 1 the Union may appeal from the decision at Step 1 to the Chancellor addressed to the attention of the Deputy Executive Director, Office of Labor Relations and Collective Bargaining within 15 school days after the Step 1 decision was given to the employee. The appeal shall be in writing, shall set forth specifically the reasons for the appeal, and shall be accompanied by a copy of the decision at Step 1. It shall also state the name of the employee's Union representative.

The Chancellor or his/her designated representative shall meet and confer with the Union representative and the aggrieved employee with a view to arriving at a mutually satisfactory resolution of the complaint. The Union representative and the aggrieved employee shall be given at least two school days notice of the conference and an opportunity to be heard. The Union representative may be the representative at Step 1 or a representative designated by the Union grievance department, or both.

Notice of the conference shall also be given to the head of the school. The head of the school will be expected to attend the conference or to have a suitable representative present at the conference in order to promote resolution of the grievance or, if resolution is not possible, to provide the necessary information for a fair determination of the grievance.

The Chancellor shall communicate his/her decision in writing, together with the supporting reasons, to the aggrieved employee and to the Union representative who participated in this step, within 20 school days after receiving the appeal.

The head of the school shall also receive a copy of the decision at this step.   The Union shall receive a copy of any decision at this step.

**2. Procedures for Special Groups of the Teaching Staff**

a. The procedures set forth in paragraph 1 of this Article shall apply to all employees in the unit, except that:

(1) In the case of teachers of the homebound, the grievance shall be presented at Step 1 to the borough supervisor.

(2) In the case of per session employees, the grievance shall be presented at Step 1 to the head of the particular per session activity or his/her designated representative and at Step 2 to the Chancellor or his/her designated representative.  The Union representative at each step shall be a member of the Union's grievance committee.  The decision at Step 1 shall be communicated within five working days after receiving the complaint of employees employed in summer per session activities and within 10 school days after receiving the complaint of employees employed in all other per session activities.  However, grievances arising under Article 15C 2 (Retention), 4 (Selection of New Per Session Teachers) or 6 (Reduction in Per Session Positions) must be presented within two workdays after the employee has knowledge of the act or condition which is the basis of the complaint.  The decision at Step 1 shall be communicated within two working days after receiving the complaint.   The grievance may be appealed by the Union to the Chancellor within five working days after the decision at Step 1 has been received.  The Chancellor shall communicate his/her decision within ten working days after receipt of the appeal.  If the grievance is not resolved at the Chancellor's level, it may be appealed to arbitration by the Union within 15 working days and the parties shall arrange for the prompt hearing of the grievance at arbitration.   The parties will make every effort to process these grievances more expeditiously than the time limits prescribed above.  The arbitrator shall render the award within five days after the close of the hearing.

(3) Chapter 683 grievances regarding summer assignments shall be heard according to the following procedure:

(a) All internal District 75 postings, vacancy notices and turnaround (retention rights) lists will be prominently posted and made available to employees in all District 75 sites.

i. All internal application notices/postings for District 75 staff who do not claim retention rights shall be posted in the schools no later than April 30.

ii. Retention rights turnaround documents shall be posted in the schools no later than May 15.

iii. The Final Assignment list shall be posted in all schools no later than June 7.

(b) Subsequently, an employee who has a complaint regarding a non-per session summer assignment shall attempt to resolve it informally.  If the complaint has not been resolved, the complainant shall file a grievance with the Superintendent no later than the 10th workday from the posting of the final assignment list, or in the case of assignments that were not contained in the final assignment list, no later than the 10th workday from knowledge of the assignment which is the basis for the complaint.  The Superintendent or his or her designee shall meet and confer with the aggrieved employee with a view to arriving at a mutually satisfactory resolution of the complaint.   The employee shall be entitled to Union representation.  The employee shall be present at this conference.  The Superintendent shall communicate his/her decision in writing, together with supporting

reasons, to the aggrieved employee and to the Union District Representative within five (5) working days after having received the appeal.

If the grievance is not resolved at the Superintendent's level, the Union may appeal the decision to the Chancellor within five (5) working days after the decision by the Superintendent or his or her designee has been issued. The appeal shall be in writing, shall set forth specifically the reasons for the appeal and shall be accompanied by a copy of the appeal and decision at Step I. The Chancellor or his/her designated representative shall meet and confer with the Union Representative and the aggrieved employee with a view to arriving at a mutually satisfactory resolution of the complaint.

The Chancellor shall communicate his/her decision in writing, together with the supporting reasons, to the aggrieved employee and to the Union Representative who participated in this step within five (5) working days after receiving the appeal. If the grievance is not resolved at the Chancellor's level, or if no decision is issued within five (5) working days from the receipt of the appeal, the UFT may proceed to arbitration. The UFT shall notify the Superintendent and the Board's Office of Labor Relations and Collective Bargaining of its intent to proceed to arbitration no later than the Monday following Labor Day of the year in which the grievance arose.

The Superintendent shall also receive a copy of the decision at this Step. The Union shall receive a copy of any decision at this Step.

(4) In the case of adult education teachers covered by this Agreement, the grievance shall be presented at Step 1 to the Executive Director or head of the particular program and at Step 2 to the Chancellor. The Union representative at each step shall be a member of the Union's grievance committee. The decision at Step 1 shall be communicated within 10 working days after receiving the complaint of the employee.

(5) In the case of teachers assigned, education administrators, education officers and education analysts, the grievance shall be presented at Step 1 to the appropriate community superintendent or his/her designee, assistant superintendent for high schools, or the Executive Director responsible for the office, and at Step 2 to the Chancellor. The Union representative at each step shall be a member of the Union's grievance committee. The decision at Step 1 shall be communicated within 10 working days after receiving the complaint of the employee.

(6) In the case of lead teachers and math and literacy coaches, the grievance shall be presented at Step 1 to the principal and at Step 2 to the Chancellor. The Union representative at each step shall be a member of the Union's grievance committee. The decision at Step 1 shall be communicated within 10 working days after receiving the complaint of the employee.

(7). In the case of mentors the grievance shall be presented at Step 1 to the Regional Director of New Teacher Induction and at Step 2 to the Chancellor. The Union representative at each step shall be a member of the Union's grievance committee. The decision at Step 1 shall be communicated within 10 working days after receiving the complaint of the employee.

b. The special procedures set forth in paragraph 4 of this Article shall not apply to per session employees, adult education teachers covered by this Agreement, teachers assigned, education administrators, education officers and education analysts.

**3. Special Procedures for Grievances Relating to Salary and Leave Matters**

Case 1:07-cv-03535-FB-CLP  Document 43  Filed 07/20/09  Page 148 of 157 PageID #: 305

Any grievance relating to salary and leave matters shall be filed by the Union directly with the Executive Director of the Division of Human Resources. In such cases, the provisions of the general procedures relating to Step 2 shall apply to the presentation and adjustment of the grievance at the level of the Executive Director except that (1) the grievance shall be filed within a reasonable time not to exceed three months after the employee has knowledge of the act or condition which is the basis of the complaint and (2) the employee need not be present at the conference. The Executive Director shall render a decision on behalf of the Chancellor and such decision shall be considered a decision at the level of the Chancellor under this Article.

**4. Special Procedures for Grievances Arising out of School Reorganization**

Where the grievance arises out of school reorganization and involves class size, teacher programs or assignments and is not covered by paragraphs 5 or 6 below, the time limits prescribed in B1 above shall be modified in these respects:

a. The grievance must be presented within two school days after the employee has knowledge of the act or condition which is the basis of the complaint, except that conformity to class size limits shall not be the subject of grievance during the first ten school days of each term.

b. The head of the school shall communicate his/her decision within two school days after receiving the complaint.

c. The grievance must be appealed by the Union to the Chancellor (Step 2) within five school days after the decision at Step 1 has been received.

d. The Chancellor shall communicate his/her decision within ten school days after receipt of the appeal.

e. If the grievance is not resolved at Step 2, it may be appealed to arbitration by the Union within 15 school days and the parties shall arrange for the prompt hearing and resolution of the grievance at arbitration.

f. The Union shall designate an order of priority for arbitration of unresolved reorganization grievances involving teacher programs or assignments. Such grievances shall be expeditiously arbitrated. Grievances heard on or before October 5th shall be decided, and the award rendered within five days. If the grievance is sustained, it shall be implemented immediately. If not rendered by October 10th, an arbitration award sustaining a grievance shall be implemented no later than the next reorganization.

**5. Expedited Reorganization Grievance Procedure**

The parties are committed to resolving reorganization grievances on an expedited basis. To that end, they have jointly adopted the appropriate and agreed upon standards for determining these cases in the hope that school administration and UFT representatives will be able to resolve many of these matters locally, without the need to resort to arbitration. The parties intend joint training to familiarize those involved with the cases in the agreed upon standards and the new procedure being adopted.

a. Reorganization arbitrations shall be scheduled during the last two (2) weeks of June, and the first three (3) weeks in September. If necessary, cases may be heard through the end of September. For reorganizations that take place in February, arbitrations shall be scheduled during the month of February. Complaints arising at any time during the school year will follow the expedited time frame detailed below. These arbitrations shall count toward the one hundred forty (140) arbitration dates that are permitted to be scheduled per year for all UFT grievances.

b. The current deadlines by which teachers must receive their programs shall continue.

c. The chapter leader shall be considered a proper grievant in all grievances relating to program deadlines and contractually mandated consultations, including allegations that postings are inconsistent with an agreement reached at contractually mandated consultations.

d. An employee shall notify the principal or his or her designee of a complaint within two (2) school days, after the employee has knowledge of the act or condition which is the basis for the complaint. Within two (2) school days following notification, the principal or his or her designee must meet with the employee in an effort to resolve the complaint. The employee may choose to be accompanied by the chapter leader. If the complaint remains unresolved, the employee shall have two (2) school days from the date of the grievance conference to file a grievance appeal with the Superintendent. A copy of the grievance appeal shall be forwarded to the chapter leader and the UFT district representative.

e. A Demand for Arbitration shall be filed contemporaneously with the district level grievance, with a copy to be forwarded to the appropriate Superintendent(s) and the Board's Office of Labor Relations and Collective Bargaining.

f. Both the employee and principal, or his or her designee, must attend a conference conducted by the Superintendent or his or her designee. The UFT district representative or his or her designee shall be present to observe the process and represent the UFT. The conference shall be held within three (3) school days of receipt of the district level grievance appeal. The Superintendent or his or her designee shall have four (4) school days from the conference to render a decision on the grievance.

g. The decision shall set forth reasons. If no decision is issued within four (4) school days of the conference, the UFT may proceed to arbitration. The UFT shall notify the Superintendent(s) and the Board's Office of Labor Relations and Collective Bargaining of its intent to proceed to arbitration.

h. Arbitrations may commence as early as seven (7) school days from the initial filing of the grievance and shall proceed using procedures detailed in paragraph F of this Article.

i. Only the following issues are appropriate reorganization grievances within the meaning of this subsection 5:

Article 7 (A, B, C, D, E, F, J and K)

1. Program Preference
    a. Grade level
    b. More/less difficult
    c. Subject
    d. Sessions
    e. Special classes
    f. Special education classes
2. Special Teaching Positions
3. Cluster Positions
4. Compensatory Time Positions
5. Rotation
6. Number of Preparations

7. Numbers of Rooms
8. Postings
9. Consultations

### 6. Expedited Procedure for Class Size and Group Size Grievances

The parties are committed to resolving class size and group size grievances on an expedited basis. To that end, they have jointly adopted the appropriate and agreed upon standards for determining these cases in the hope that school administration and UFT representatives will be able to resolve many of these matters locally, without the need to resort to arbitration. The parties intend joint training to familiarize those involved with the cases in the agreed upon standards and the new procedure being adopted.

a. During the first ten (10) school days of each term, the chapter leader and the principal shall attempt to resolve informally all class size and group size problems within the school. It is expected that during the first ten (10) school days, the principal will consult and seek assistance from the superintendent and the chapter leader will consult with the UFT district representative to attempt to resolve all class size and group size problems. Complaints arising at any time during the school year will follow the expedited time frame detailed herein.

b. If the principal and chapter leader cannot resolve class size and group size problems within the school, after the first ten (10) school days, the Union may file a demand for arbitration within two (2) school days of their failure to resolve the grievance.

Such demand shall be filed by facsimile, or any other agreed upon method, to the affected Superintendent(s) and the Board's Office of Labor Relations and Collective Bargaining.

c. Arbitrations shall commence within five (5) school days of the demand for arbitration. The class size arbitrations shall count toward the one hundred forty (140) arbitration dates that are permitted to be scheduled per year for all UFT grievances and shall proceed using procedures detailed in paragraph G of this Article. Group size arbitrations do not count toward the 140 arbitration dates, and shall proceed pursuant to paragraph G of this Article.

### 7. Priority Handling of Grievances

The Board and the Union will consult periodically on the priority of handling grievances pending at Step 3 with a view to expediting the processing of grievances which require prompt disposition.

### 8. Initiation or Appeal of Special Types of Grievances or Complaints

a. Grievances arising from the action of officials other than the head of a school may be initiated with and processed by such officials in accordance with the provisions of Step 2 of this grievance procedure. Where appropriate, such grievances may be initiated with the Chancellor by the Union.

b. Where a substantial number of employees in more than one school (or, in the case of teachers of the homebound, in more than one borough) have a complaint arising from the action of authority other than the head of a school (or borough supervisor) the Union, upon their request, may initiate a group grievance in their behalf.

c. The Union has the right to initiate or appeal a grievance involving alleged violation of the Agreement. Such grievance shall be initiated with the appropriate community or assistant superintendent or where appropriate, with the Chancellor.

### 9. Appearance and Representation

Conferences held under this procedure shall be conducted at a time and place which will afford a fair and reasonable opportunity for all persons entitled to be present to attend. When such conferences are held during Board of Education working hours, all persons who participate shall be excused without loss of pay for that purpose.

**10. Time Limits**

a. Failure at any step of this procedure to communicate the decision on a grievance within the specified time limits shall permit the aggrieved employee to proceed to the next step. Failure at any step of this procedure to appeal a grievance to the next step within the specified time limits shall be deemed to be acceptance of the decision rendered at that step.

b. The time limits specified in any step of this procedure may be extended, in any specific instance, by mutual agreement.

**C. Arbitration**

A grievance dispute which was not resolved at the level of the Chancellor under the grievance procedure may be submitted by the Union to an arbitrator for decision if it involves the application or interpretation of this Agreement. Grievances involving the exercise of Board discretion under any term of this Agreement may be submitted to arbitration to determine whether the provision was disregarded or applied in a discriminatory or arbitrary or capricious manner so as to constitute an abuse of discretion, namely: whether the challenged judgment was based upon facts which justifiably could lead to the conclusion as opposed to merely capricious or whimsical preferences, or the absence of supporting factual reasons.

A grievance may not be submitted to an arbitrator unless a decision has been rendered by the Chancellor under the grievance procedure, except as provided in Section B6b of this Article, and except in cases where, upon expiration of the 20-day time limit for decision the Union filed notice with the Chancellor of intention to submit the grievance to arbitration and no decision was issued by the Chancellor within five school days after receipt of such notice.

The proceeding shall be initiated by the Union filing with the Board a notice of arbitration. The notice shall be filed within 15 school days after receipt of the decision of the Chancellor under the grievance procedure or, where no decision has been issued in the circumstance described above, three days following the expiration of the five school day period provided above. The notice shall include a brief statement setting forth precisely the issue to be decided by the arbitrator and the specific provision of the Agreement involved. The parties shall jointly schedule the arbitration hearings.

A panel of seven arbitrators shall be designated by mutual agreement of the parties to serve for any case or cases submitted to them in accordance with their ability to promptly hear and determine the case or cases submitted;

Arbitrators shall serve one year terms which extend from September 1 through August 31 of the following year. Arbitrators who are selected after September 1 shall hear cases for a minimum of one year, with a term ending on August 31;

Arbitrators will be continued for additional one year terms, unless either party discontinues the services of any of the panel arbitrators by notification to the other party by May 15 that such arbitrators shall not be selected for an additional term. Arbitrators not selected by the parties to serve an additional term will be notified jointly by the parties;

Arbitrators who are not continued for an additional term shall finish any case they have begun hearing;

If a panel arbitrator(s) is not continued for an additional one year term, a replacement(s) shall be selected to serve on the panel by the mutual agreement of the parties. Should agreement not be reached in sufficient time to ensure that the replacement arbitrator(s) commences service on September 1, the parties shall maintain the same number of hearing dates which would have existed if the replacement arbitrator(s) could have provided dates starting in September. The parties further agree to schedule the same number of dates, regardless of the number of arbitrators on the panel, normally scheduled in a school year. This maintenance of service shall be accomplished in the following manner:

a. First, by requesting additional hearing dates from the panel arbitrators; and

b. If necessary, by requesting hearing dates from arbitrators previously agreed upon for this purpose; and

c. If necessary, by requesting that the American Arbitration Association provide simultaneously to each party an identical list of names of persons chosen from the Panel of Labor Arbitrators, as outlined in Rule 12 of the A.A.A. Labor Arbitration Rules (as amended and in effect January 1, 1992).

The parties agree to enter into a stipulation of facts whenever possible in advance of the hearing.

The parties seek the most expeditious decisions in arbitrations and will not normally file briefs or order transcripts. If either or both parties order transcripts, it shall be on an expedited basis. The parties may agree to file post-hearing briefs. However, if a party unilaterally files a brief, it shall be filed within five working days of the hearing or receipt of the transcript, if one is ordered. The other party shall have the right to file a reply brief within five working days of receipt of the brief.

The voluntary labor arbitration rules of the American Arbitration Association shall apply to the proceedings insofar as they relate to the hearings and fees and expenses.

The arbitrator shall issue his/her decision not later than 30 days from the date of the closing of the hearings or, if oral hearings have been waived, then from the date of transmitting the final statements and proofs to the arbitrator. The decision shall be in writing and shall set forth the arbitrator's opinion and conclusions on the issues submitted. The arbitrator shall limit his/her decision strictly to the application and interpretation of the provisions of this Agreement and he/she shall be without power or authority to make any decision:

1. Contrary to, or inconsistent with, or modifying or varying in any way, the terms of this Agreement or of applicable law or rules or regulations having the force and effect of law;

2. Involving Board discretion under the provisions of this Agreement, under Board by-laws, or under applicable law, except that the arbitrator may decide in a particular case whether the provision was disregarded or applied in a discriminatory or arbitrary or capricious manner so as to constitute an abuse of discretion, namely whether the challenged judgment was based upon facts which justifiably could lead to the conclusion as opposed to merely capricious or whimsical preferences or the absence of supporting factual reasons.

3. Limiting or interfering in any way with the powers, duties and responsibilities of the Board under its by-laws, applicable law, and rules and regulations having the force and effect of law.

The decision of the arbitrator, if made in accordance with his/her jurisdiction and authority under this Agreement, will be accepted as final by the parties to the dispute and both will abide by it.

The arbitrator may fashion an appropriate remedy where he/she finds a violation of this Agreement. To the extent permitted by law, an appropriate remedy may include back pay. The arbitrator shall have no authority to grant a money award as a penalty for a violation of this Agreement except as a penalty is expressly provided for in this Agreement.

The arbitrator's fee will be shared equally by the parties to the dispute.

The Board agrees that it will apply to all substantially similar situations the decision of an arbitrator sustaining a grievance and the Union agrees that it will not bring or continue, and that it will not represent any employee in, any grievance which is substantially similar to a grievance denied by the decision of an arbitrator.

**D. General Provisions as to Grievances and Arbitration**

1. The filing or pendency of any grievance under the provisions of this Article shall in no way operate to impede, delay or interfere with the right of the Board to take the action complained of, subject, however, to the final decision on the grievance.

2. Nothing contained in this Article or elsewhere in this Agreement shall be construed to permit the Union to present or process a grievance not involving the application or interpretation of the terms of this Agreement in behalf of any employee without his/her consent.

3. Nothing contained in this Article or elsewhere in this Agreement shall be construed to deny to any employee his/her rights under Section 15 of the New York Civil Rights Law or under the State Education Law or under applicable Civil Service Laws and Regulations.

4. (a) Procedural arbitrability objections based upon the asserted:

Untimeliness of a grievance or appeal, or failure to follow or properly adhere to contractual grievance procedures will, normally, be raised at the Chancellor's level. In instances where the employer could not reasonably have been able to raise such a claim at the Chancellor's level, but intends to raise such a claim at the arbitration level, for the first time, the employer shall communicate to the Union within one week prior to the scheduled hearing of such intent.

(b) These guidelines are not intended to be applied to preclude a party from raising an arbitrability objection at a hearing where such preclusion would appear to be unfair or substantially prejudicial to a party's interest in the ultimate outcome of a case.

(c) Nothing contained herein shall be construed as a waiver of any substantive arbitrability objection or to preclude any other resort to judicial proceedings as provided by law.

**E. Expedited Arbitration Procedure for the Lead Teacher Applicant Pool**

The purpose of this procedure is to carry out the intent of the parties set forth in Article 11 IV A10 to resolve promptly all disputes regarding the Applicant Pool of Lead Teachers subject to expedited arbitration.

To the extent possible, each expedited arbitration shall be completed by the last day of June of the school year in which the application was made. The parties to the arbitration shall make all necessary reasonable efforts to complete the procedure by the deadline, including shortening the time frames if necessary.

1. Every Regional Personnel Committee that rejects an application for inclusion in the pool shall notify the rejected candidate of the right to challenge the decision according to this procedure.

2. The Appellant — a candidate who is not selected by the Regional Personnel Committee — shall initiate the challenge by filing a written request for review with the United Federation of Teachers Coordinator. The request must be filed within five calendar days (not counting weekends and holidays) after the Appellant receives the Personnel Committee's decision and right-to-challenge notice. The Appellant is limited to filing no more than three review requests.

3. The request shall include the name, address and phone number of the Appellant, the Regional Pool applied for, and a statement that the review of the Regional Personnel Committee's decision is requested. A form for this purpose shall be available from the Board, the Union and the School Personnel Committee.

4. Upon receiving the request, the UFT Coordinator shall notify the Regional Personnel Committee and the arbitrator that a request for review has been filed. The Regional Personnel Committee shall immediately respond to the UFT Coordinator with the following information: the names of the successful candidates; the qualifications for the position; and the reasons it rejected the Appellant. The UFT Coordinator shall then send that information to the Appellant.

5. The Chancellor and the UFT President or their designees shall jointly select an arbitrator (or arbitrators) to arbitrate these cases. The Board and the Union shall share the arbitrators' fees equally.

6. The parties to the proceeding shall be the Regional Personnel Committee and the Appellant(s). If there is more than one Appellant who was rejected for the same Regional Pool, the arbitrator shall consolidate and hear together their requests for review.

7. The arbitrator shall schedule the hearing to start not later than seven (7) days (not counting weekends and holidays) after the UFT Coordinator received the request for review.

8. In order to develop a full and complete basis for a decision, the arbitrator shall inquire fully into all matters in issue. The Appellant(s) should be prepared to state the basis of the challenge and may do so at any time during the hearing. The Regional Personnel Committee should be prepared to support the basis for its decision.

9. The arbitrator shall issue a written, signed award within five (5) days of the close of the hearing. If the arbitrator sees the need for an opinion, it shall be in summary form.

10. If the arbitrator sustains the challenge, the Appellant shall be included in the Regional Pool applied for.

11. The arbitrator's power and authority under this procedure shall be only to resolve an Appellant's challenge to the decision of the Regional Personnel Committee. The arbitrator's decision shall be limited strictly to the application and interpretation of the Plan's applicable provisions. Other grievances or complaints arising in a school shall be resolved through the procedures appropriate to them.

12. The parties shall accept as final the arbitrator's award and abide by it if it is made in accordance with the jurisdiction and authority granted under this procedure.

13. Regarding the hearings, fees and expenses, the proceedings shall follow the Expedited Labor Arbitration Procedures of the American Arbitration Association as amended and effective on September 1, 1993, as long as they do not conflict with the procedures described above.

## F. Arbitrations Pursuant to the Expedited Reorganization Grievance Procedure

Arbitrations filed pursuant to the Expedited Reorganization Grievance Procedure in B5 above shall be processed as follows:

1. Each Arbitrator shall hear up to five (5) reorganization grievances in a day. Where possible, grievances from the same school and/or borough shall be scheduled on the same day.

2. The arbitration shall be informal and proceed in the following manner:

a. The parties shall provide the Arbitrator at the beginning of each case all relevant documents, such as, but not limited to: 1) Postings; 2) Preference sheets; 3) Resumes; and 4) Seniority lists.

b. The Grievant and the Principal, or his or her designee, must be in attendance. Each side shall have thirty (30) minutes to present their respective cases. The Arbitrator may extend this time limit. Only disputed facts shall be presented to the Arbitrator.

c. Witnesses for the Union and the Board shall be limited to discuss only those facts in dispute.

d. In order to develop a full and complete basis for a decision, the Arbitrator shall inquire fully into all matters at issue.

3. Each Arbitrator shall be given precedential reorganization decisions with the agreed upon reorganization standards. No other decisions shall be presented except relevant regular panel member decisions decided subsequent to July 1, 2001.

4. At any time prior to issuance of an award, either party may decide that a case may have precedential value and shall be referred for an arbitration hearing pursuant to Article 22C, and the rules applicable to that procedure shall apply. The next panel member in the established rotation shall be assigned the case.

5. The Arbitrator shall issue an Award within five (5) school days of the arbitration hearing. Such Award may be transmitted by facsimile directly to the parties, including the Board's Office of Labor Relations and Collective Bargaining and the UFT's Grievance/Arbitration Department. Arbitrators shall not issue written Opinions unless jointly requested by the parties. The Award is non-precedential unless the parties jointly request a formal written Opinion.

6. All sustained Awards shall be implemented within five (5) school days of issuance, unless otherwise specified by the Award, except that decisions rendered on or after October 10th shall be implemented no later than the next reorganization.

7. The Arbitrator shall retain jurisdiction until the next reorganization unless otherwise specified in the Award.

8. If an Arbitrator is unable to complete his or her assignment before issuing his or her Award, the American Arbitration Association shall appoint the next panel member in the established rotation.

Case 1:07-cv-03535-FB-CLP   Document 43   Filed 07/20/09   Page 156 of 157 PageID #: 313

**G. Arbitrations Pursuant to the Expedited Procedure for Class Size and Group Size Grievances**   Arbitrations filed pursuant to the Expedited Procedure for Class Size and Group Size Grievances in B6 above shall be processed as follows:

1. Each arbitrator shall hear up to five (5) schools' class size and/or group size cases in a day.  Where possible, schools within the same superintendency shall be scheduled on the same day.

2. The arbitration hearing shall be expedited in the following manner:

a. The Union shall provide the Arbitrator with a standardized form, agreed upon by the parties, with the following agreed upon information at the beginning of each case:

(1). Name of Teacher (for identification purposes only)

(2). School

(3). District

(4). Classes/Groups which are oversized

(5). Registers of each class/group on the grade or subject/course name, as applicable, being  grieved

(6). Prior grievance history

b. The UFT District Representative and Superintendent, or their designee, shall each have thirty (30) minutes to present their respective cases.  The Arbitrator may extend this time limit.  Only disputed facts shall be presented to the Arbitrator.

c. Witnesses for the Union and the Board shall be limited to discuss only those facts which are in dispute.

d. In order to develop a full and complete basis for a decision, the Arbitrator shall inquire fully into all matters at issue.

e. Each Arbitrator shall be given precedential class/group size decisions with the agreed upon class/group size decision summaries.  No other decisions shall be presented except relevant regular panel member decisions decided subsequent to July 1, 2001.

f. At any time prior to issuance of an award, either party may decide that a case may have precedential value and shall be referred for an arbitration hearing pursuant to Article 22C, and the rules applicable to that procedure shall apply.  The next panel member in the established rotation shall be assigned the case.

g. The Arbitrator shall issue an Award within five (5) school days of the arbitration hearing.  Such Award shall be transmitted by facsimile directly to the UFT District Representative, the Superintendent(s), the UFT Grievance/Arbitration Department and the Board's Office of Labor Relations and Collective Bargaining.  The Award shall include the following information:

(1) Sustained or denied.

(2) If sustained, the guidelines for compliance (e.g., equalization, new class or monetary penalty).

(3) If denied, the basis for the denial.

Arbitrators shall not issue written Opinions unless jointly requested by the parties. The Award is non-precedential unless the parties jointly request a formal written Opinion.

h. All sustained Awards shall be implemented within five (5) school days of issuance. No class that ultimately complies with the contractual maximum class size limitations shall constitute an Article 7M3 class size exception, except that said Awards can be used for grievance history background.

    i. The Arbitrator shall retain jurisdiction over his or her decision.  If a sustained Award is not implemented within five (5) school days, the Arbitrator shall convene a conference between the Board's Office of Labor Relations and Collective Bargaining and the UFT's Grievance/Arbitration Department within five (5) school days, but no earlier than October 1st in the case of class size grievances.

    j. If the Board asserts that it cannot comply with the Arbitrator's Award, it must set forth a plan of action to remedy the class size or group size violation.  If the Board has acted in good faith, and the plan of action is not unreasonable, it will be accepted by the Arbitrator.

    k. If the Arbitrator concludes that the Board's plan of action is not appropriate, he or she shall be empowered, on a non-precedential basis, to issue a Supplemental Award within five (5) school days, as follows: For elementary schools, the school may be directed to add one additional paraprofessional for every two oversized classes in a grade, or at the school's option, one teacher for every four classes, with a minimum of one hour teacher coverage per oversize class.  For all other school organizations, the school may be directed to implement a comparable remedy appropriate to the level.  In the case of group size awards, the Arbitrator may impose a monetary penalty.